[No. 6438.]

IRONSTONE DITCH COMPANY ET ALS. V. ASHENFELTER ET ALS.

1. WATER RIGHTS—*Adjudication of Priorities—Effect of Decree*—
A decree under the statute (Rev. Stat., §§ 3276-3306) adjudicating the
priorities to the use of water settles everything necessary to complete
appropriation and binds all those participating in the proceeding. (39)

2. ——*Nature of the Right—Alienation—Change of Use or Place*—
The right to the enjoyment of water for a beneficial purpose is not con-
fined to the particular land where the water is first applied; it may be
alienated, independently of the land, and changed from place to place,
with the single limitation that the change shall not injuriously affect
the vested rights of others. (39, 40)

The change must, however, receive judicial sanction by proceedings
under the statute. (Rev. Stat. § 3226.) (40)

The evidence examined and held that the transfer of a volume of
water from the original point of diversion, to a point miles up the
stream was beneficial rather than injurious to those protesting. (45,-
46)

3. ——*Seepage Water—Appropriation*—Under Rev. Stat. § 3177,
seepage water which is being wasted is the subject of appropriation.
The appropriation thereof is not included in or controlled by a prior
adjudication decree in the same district. (42)

4. ——*Use of Stream as a Conduit*—Whoever has developed water
from a source extraneous to the stream may discharge it into the
stream, and, using the stream as a conduit withdraw it below. (44)

*Appeal from Montrose District Court.*—Hon SPRIGG
SHACKLEFORD, Judge.

Mr. T. J. BLACK, Mr. S. S. SHERMAN, Mr. MILTON R.
WELCH, for appellants.

Messrs. BELL, CATLIN, BLAKE & MOTHERSILL, Messrs.

Story & Story, Mr. John Gray, Mr. Millard Fairlamb, for appellees.

Mr. Justice Garrigues delivered the opinion of the court.

This case involves a transfer on the Uncompahgre river, of early priorities from ditches located down the stream in the neighborhood of Delta, up the stream, above the city of Montrose, into the Montrose & Delta canal, called the Montrose canal, and is the sequel of *Ashenfelter v. Carpenter* and *Gutshall v. Carpenter,* Nos. 4834 and 4862, 37 Colo. 534 and 536, 87 Pac. 800, 801. The court entered a permissive decree allowing the change, and protestants bring the case here on appeal.

1. November, 1888, the general adjudication decree entered in the district court at Montrose settled the priorities of all the ditches in water district No. 41, involved in this controversy, diverting water for irrigation from the Uncompahgre river. This decree awarded the Boles & Manney ditch No. 1½, priority 1½ for 3.22, the Eggleston No. 2, priority No. 2 for 6, the Uncompahgre No. 3, priority No. 3 for 12, the Homestake No. 4, priority No. 4 for 11, and Delta No. 11, priority No. 11 for 15 cubic feet per second. There is no ditch or priority No. 1. The headgates of these early ditches are located down the stream, near its junction with the Gunnison river, while the headgate of the Montrose canal is located upstream, some 25 or 30 miles. The headgate of the Uncompahgre ditch No. 3, taken for illustration, as an initial point, is on the east side of the river, and about 3 miles above the junction; Eggleston No. 2 is on the west side and about a quarter of a mile above No. 3; Homestake No. 4 is some 6 or 7 miles above No. 3 near Olathe; Boles & Manney No. 1½ is about a quarter of a mile above No. 2; the Rustler is about 4½ miles above No. 2; Delta No. 11 is about three-quarters of a mile below No. 3. These ditches and priorities are referred to in the briefs and evidence, and seem

to be known better locally, by their numbers than their names, as 1½, 2, 3, 4, 11, etc.   For convenience, the diverse applications to change the points of diversion will be arranged into three groups:   First, those made by persons desiring to change 2 and 3 priorities from 2 and 3 headgates into the Montrose canal; second, the application of Gutshall to change .6 of a foot from No. 2, and 5 5/14 feet from No. 11 into the Rustler ditch about 4½ miles above No. 2; and third, the application of John and Jesse Bell to change 3.3 feet from No. 4 (Homestake) into the Montrose canal.   The headgates of the Eggleston and Uncompahgre ditches (priorities 2 and 3, for 6 and 12 feet respectively) are about 1½ or 2 miles above the town of Delta and very close together.   The storm center of this litigation is around the transfer of these 2 and 3 priorities, and while the transfer of Homestake priority No. 4 water by the Bells into the Montrose canal, and the transfer of Delta No. 11 water by Gutshall into the Rustler are involved, our attention will be directed to the transfers of 2 and 3, as the determination of the right to make these changes is controlling of the whole controversy involved, not only in this, but also in the *Moore* case, No. 5891, as well.   The priorities of the protesting ditches are ahead of the Montrose canal, but are junior to 2 and 3, and they are located principally below the city of Montrose and above the headgates of 2 and 3; that is, protestants' headgates are located between the old and new points of diversion, and are so situated that their ditches consume all the accretions above 2 and 3.

The Uncompahgre river heads in Ouray county in the East Elk or Saw Tooth range of mountains, where it is fed by melting snow, and running northerly from Ouray, empties into the Gunnison just below the town of Delta.   During the June flood all the ditches have a sufficient supply without observing the decrees, and water runs to waste; but later in the season the normal flow is so low that water for irrigation is scarce, and it becomes necessary for the officials to enforce the decreed priorities.   The Montrose canal crosses the bottom, and

reaches the top of Spring creek mesa on the west side, where it irrigates extensive farms and fruit orchards. The original owners of the early ditch priorities held their rights to the use of the water in severalty. During 1896 and 1898, most of the 18 feet decreed to 2 and 3 was purchased from the divers individual owners by farmers and horticulturists, who caused it to be transferred from 2 and 3 to the Montrose canal, for their use on Spring creek mesa. These changes in the point of diversion were perfected at the time of the sale of the water rights, and the state engineer, the irrigation division engineer of the water division, and the water commissioner of district No. 41, assisted in making the transfers, and delivered the water into the Montrose canal until 1904, when the water commissioner refused longer to recognize the transfers, until the decree authorizing and permitting the change in the point of diversion required by the statute, had been obtained. The purchasers of this water contended that the statute regarding the transfer of decreed rights (Laws of 1903, p. 278) was prospective and not retrospective, and did not apply to them, and in 1904 brought an injunction suit against the water commissioner of 41, to restrain him from taking the transferred water out of the Montrose canal, or from refusing to divert it into the canal headgate. This injunction suit was decided against them on demurrer, and they appealed the case to this court. Some time during the happening of these events, or at least about this time, Thomas M. Moore and others, who had purchased from the original owners some of this early priority water, filed petitions in the district court, to change its point of diversion into the Montrose canal. While the *Moore* case was pending, and after the demurrer to the injunction suit was sustained, and judgment entered against them below, appellees in this case filed in the district court at Montrose, petitions asking to change the point of diversion of the water they had theretofore purchased, or to confirm the transfers already made. These petitions were consol-

idated for hearing and tried with the *Moore* proceeding;
but before any action was taken thereon, they obtained
an order permitting them to withdraw from the *Moore*
case, dismissed their petitions therein in the district
court, and appealed the original injunction suit, which
had been decided against them on demurrer, to this court.
(See 37 Colo. 534-36.)   The *Moore* case was tried, the
applications therein to change the point of diversion were
denied, and they appealed that case which is No. 5891, to
this court.   The injunction suit was affirmed by us, but
without prejudice to the right of appellees to bring and
maintain subsequent proceedings, under the statute, to
change the point of diversion.   Thereupon appellees, as
petitioners began another proceeding in the district court
at Montrose in April, 1907, asking the court to permit a
change in the point of diversion, or to confirm the change
already perfected.   A referee was appointed who took the
evidence and reported his findings.   By stipulation the
bill of exceptions, which preserved the evidence in the
*Moore* case, was received in evidence in this case, together
with such additional testimony as the parties saw fit to
introduce.   The referee found appellees owned the trans-
ferred water; that they purchased it between April, 1896
and November, 1898, from the original priority owners,
and immediately thereafter changed the point of diver-
sion from the headgates where it was originally decreed,
to the headgate of the Montrose canal where it has since
been continuously used by them in connection with the
cultivation of their lands; that the change was not only
without injury to protestants and all others on the river,
but beneficial to them, and found petitioners were en-
titled to a decree permitting the change, which findings
the court approved and entered a decree accordingly.

Spring creek mesa, upon which the water is used,
consists of about 8,000 acres of table land, at an elevation
of some 80 to 100 feet above the river bottom.   The soil
is a light, fertile loam, underlain with a bed of gravel,
resting upon an impervious shale.   Numerous ravines
and draws, which drain into the river, traverse the mesa,

and Spring creek, skirting its western boundary, empties into the river some 5 or 6 miles below Montrose. Water spread upon the mesa in irrigation sinks rapidly through the loam and gravel until it is stopped by the shale, and the gravel bed filling with water becomes a large underground reservoir. It then breaks out in springs along Spring creek, and in the draws, gulleys, and ravines, and is carried back into the river. Also at places above the mouth of Spring creek the river runs in against the bluffs or cliffs of the mesa, and the seepage water is carried along the floor of the shale, directly into the river. It is estimated that a great percentage of the water spread upon the mesa in irrigation is in this way returned to the river between the river bridge, west of Montrose, and the mouth of Spring creek, a distance of some 5 or 6 miles. During times of scarcity late in the season, the normal flow of the river past the Montrose headgate was about 40 or 50 feet, and most of this disappeared in the sand between the headgate and Montrose, the greatest loss occurring at what the witnesses designate the "dry bar," about 2 miles above the city, where the water was lost with no visible indications that it reappeared further down the river. On the east side there is no available seepage into the river, and below the mouth of Spring creek, on the west side, that is between the mouth of Spring creek and the headgates of 2 and 3, a distance of some 10 or 15 miles, there is no seepage into the river. While there is some seepage between the Montrose canal headgate and the bridge west of Montrose, it is principally lost by sinking. Whatever seepage arises from irrigation under 2, 3 and 11, drains into the Gunnison or Uncompahgre rivers below the ditches. The available accretions or return waters to the river from irrigation on Spring creek mesa enter along the river between the bridge west of Montrose and the mouth of Spring creek, a distance of 5 or 6 miles. No claim is made that these irrigation rights settled by the adjudication decree were ever abandoned. The evidence shows the owners exhausted every legitimate means within their power to get

this water down the river, past protestants' headgates for use in their own ditches, and most of them became improverished by the loss of their crops, and expenses of litigation in these attempts. At their request the county officials placed numerous patrolmen on the river, but they were unable to keep the gates above, closed down. In some instances the deputies were thrown into the river, in others they were fired upon, the gates were raised, and the water taken by ditches that were not entitled to it. Finally the state engineer, the division engineer, and the water commissioner of district 41 gave up trying to force this early priority water down to 2 and 3 headgates in times of scarcity, when the decrees had to be enforced. After personally investigating the conditions on the river they saw the impracticability of trying to bring so small a stream over so large a river bed with so great a loss, for the purpose of delivering 18 feet of early priority water at the headgates of 2 and 3. They were convinced that it would be a benefit to every one on the river, and an injury to none, to have this early water transferred into the Montrose canal. They suggested the transfers as a solution of the problem and assisted in finding purchasers, and it was through their influence, assistance, co-operation and direction, that the water rights were sold, and these officials gave evidence on the trial of cogent and convincing character why the transfers should be permitted.

In 1890 and 1891 the owners of No. 3 (the Uncompahgre ditch), whose water had been taken from them by the ditches above, protesting ditches in this case, being unable to obtain their priority river water, constructed what is termed in the evidence, the Feeder ditch. They went over upon the west side of the river, around the point of Ash mesa where seepage had broken out and was flowing into the river below the ditches, or being wasted in bogs and marshes, and constructed this Feeder ditch, and by taking advantage of the elevation, and the side of the mesa, conducted this water up the river, and dropped it into the stream above their headgate. It was

water which had not reached the river above their head-gate, and would not have done so except for their labor in constructing the Feeder ditch, and carrying it up there. The Feeder ditch is flumed across No. 2, which some-times uses the Feeder water. Also seepage water arising on the lands of the No. 2 owners was permitted to flow into the ditch, and used when they could not get their priority water, late in the season. During flood time, when there was plenty of water in the river, and no occa-sion for enforcing the decrees, the lands under 2 and 3 were irrigated from the river through 2 and 3 head-gates; but during times of scarcity, when the priorities are enforced they have not, since they sold these rights, used 2 and 3 priorities, but have relied on the Feeder ditch and the seepage water coming into No. 2 ditch below its headgate. Priorities 2 and 3, since the trans-fers, have been taken out into the Montrose canal, and used there, and nowhere else.

The alleged double use of these priorities, occasioned by the change in the point of diversion, is the substance of the matter complained of as injuriously affecting the vested rights of protestants in and to the use of the water of the river; that is, priorities 2 and 3 have been sold and transferred up the river into the Montrose canal, they say, and still are supplied by the accretions, and used at the original points of diversion down the river below protestants' headgates; that to the extent these priorities can be supplied by seepage, at the original point of diver-sion, they are injuriously affected by depleting the river above their headgates. Whether the Feeder ditch is an independent right, separate from the original decree, de-veloped since the adjudication, or whether it is controlled by the decree, is the principal question involved. The grievance of protestants is that these priorities are being used at the new and old points of diversion at the same time, because the seepage constitutes a part of the decreed priorities. Ditches 2 and 3, since the sale, have made no demand for the priority water, and protestants are not trying to force down this early water to 2 and 3 head-

gates. They are trying to prevent the purchasers from diverting it into the Montrose canal, so they can use it themselves, upon the theory that 2 and 3 do not need this water, because they are supplied by the accretions below protestants' headgates. The Boles & Manney ditch, a quarter of a mile above No. 2, takes all the water at its headgate, and the seepage into the river between it and No. 2 headgate is very small, fluctuating, and uncertain. The water below protestants' headgates used by 2 and 3 in times of scarcity, since the sale, is that arising either on the property of the land owners under No. 2, or which is supplied by the Feeder ditch. All the accretions into the river above the Boles & Manney ditch that do not sink and disappear, are taken up and used by the protesting ditches, and it is only the use of the seepage between 1½ and 2 and 3, of which they complain.

2. The adjudication decree settled all matters and questions that were necessary to constitute a complete appropriation.—*O'Brien v. King*, 41 Colo. 487, 92 Pac. 945; *P. V. I. Co. v. Central Co.*, 32 Colo. 102, 75 Pac. 391; *Water Co. v. Irrigation Co.*, 24 Colo. 322, 51 Pac. 496, 46 L. R. A. 322; *Ditch Co. v. Ditch Co.*, 22 Colo. 115, 43 Pac. 540.

The owners and claimants of the protesting ditches participated in this proceeding, and obtained decrees settling the priorities of their ditches, and are bound by the decree awarding for irrigation use, this early priority water to the Eggleston and Uncompahgre ditches. The decree determined the volume and the date of the priorities, for use during the irrigating season. This right to use in times of scarcity a definite volume of water, in a fixed order of priority, from the natural streams, is one of the most valuable property rights known to the law of this state, which in no way depends on the place of its application, and is not confined to the land upon which the right came into existence; but may be sold separate from the land and changed from one place to another. Only a few of the many cases need be cited to show that we are committed to the doctrine that the point of diver-

sion, the conduit, the place of application, and character of use, may each and all be changed. *Strickler v. Colorado Springs,* 16 Colo. 61, 26 Pac. 313, 25 Am. St. Rep. 245; *City of Telluride v. Davis,* 33 Colo. 355, 80 Pac. 1051, 108 Am. St. Rep. 101; *Wadsworth D. Co. v. Brown,* 39 Colo. 62, 80 Pac. 1060; *Oppenlander v. Left Hand D. Co.,* 18 Colo. 142, 31 Pac. 854; *Irrigating Co. v. Reservoir Co.,* 25 Colo. 144, 53 Pac. 318, 71 Am. St. Rep. 123; *King v. Ackroyd,* 28 Colo. 495, 66 Pac. 906; *Seven Lakes Co. v. Irrigation Co.,* 40 Colo. 382, 93 Pac. 485, 17 L. R. A. (N. S.) 329. The only limitation placed upon the right is the injurious effect that the change may have upon the vested rights of others in and to the use of the water of the stream.

In *Strickler v. Colorado Springs, supra,* the conduit was changed from an irrigating ditch to a city pipe line; the point of diversion was changed from the headgate of the irrigating ditch into the intake of the pipe line; the character of the use was changed from irrigation to general city use; and the place of application was changed from an irrigated farm to the city hydrants. In *Irrigating Co. v. Reservoir Co.,* 25 Colo. 148, 53 Pac. 320, 71 Am. St. 123, where the conclusion reached in the *Strickler* case was attacked as unsound, we say in reference to that case: "Much of the argument might be pertinent were the doctrine of that case an open question, but not only in this state, but in all others in which the system of appropriation prevails, the same result has been reached where the question has been raised. With the conclusion reached in that case we are content." In *City of Telluride v. Davis, supra,* the water right came into existence on a mining placer location, and was afterwards transferred to a ranch and use for irrigation. The owner of the ranch thereafter sold the right to the city of Telluride, which changed the point of diversion into its pipe line, and the nature of the use to city purposes. Here we have three changes in the character of the use, three in the place of application, and at least two in the point of diversion, all in the same water right.

Petitioners purchased from, and the owners conveyed to them this valuable property right in and to the use of the water, and they became the owners of the priorities that had ripened on the land, and attached to the ditches. The right became their right, and they could transfer it into the Montrose canal upon a compliance with the statute. The statute provides in substance, that every person desiring to change the point of diversion of his right to use water from any of the streams, shall present a petition to the proper court praying that the change be granted, and the court after hearing the evidence shall determine whether the proposed change will injuriously affect the vested rights of others in and to the use of the water, and unless it so appears it shall enter a decree permitting the change as prayed. Sections 3226, 3227, R. S. 1908. So the only question involved in the case is whether the proposed change will injuriously affect the vested rights of others in and to the use of the water of the stream.

3. The injurious effect, if any, upon the vested rights of others, in and to the use of the water of the stream, occasioned by changing the point of diversion will be considered along two lines or branches of the case: First, whether the accretions into the river above the Eggleston and Uncompahgre headgates, and below the Boles & Manney headgate, supply 2 and 3 priorities at the old point of diversion; second, whether the findings of the court, that the changes were a benefit and not an injury to the vested rights of others in and to the use of the water, is sustained by the evidence.

It will be remembered that the headgates of the senior ditches, 2 and 3, from which the changes were made, are located down the river, that the headgate of the junior ditch, the Montrose canal, into which the transfers were made, is located 25 or 30 miles up the river, and that the headgates of protesting ditches, having intervening priorities, are located between the new and old points of diversion. Protestants claim that these senior rights, as long as they are retained at the old points of

diversion, are or could be supplied by the return waters into the river below protestants' headgates; therefore when used at the old point of diversion, although senior in priority, they do not deplete the river above protestant's headgates who are not required to allow any water to pass their headgates to supply them; but that it depletes the river above protestants' headgates to supply these priorities into the Montrose canal, and to that extent, deprives them of the use of water theretofore enjoyed, and that this constitutes a change in the physical conditions on the river which injuriously affects their vested rights into and to the use of the water.

There is no return water into the river between the Boles & Manney, and 2 and 3 headgates, or if there is, it is very small and insignificant. It is the Feeder ditch, and the seepage water into No. 2 below its headgate, that protestants term the accretions supplying these priorities below their headgates, of which they complain.

The sale, and transfer of these early rights into the Montrose canal, did not preclude the land upon which they ripened and from which they were severed, being irrigated by other water, or with rights other than the ones transferred. It was no surrender of the junior rights of the land owners, or the right to appropriate any unappropriated water, or of developing or procuring water from an independent source, which otherwise would not reach the stream.

It must not be forgotten that No. 3 consumers constructed at their own labor and expense the Feeder ditch by which the seepage water around the rim of Ash mesa, doing no one any good, was conveyed a mile up the river and emptied in the stream just above their headgate. This was an independent appropriation from extraneous sources, which they could make under the seepage act of 1889, section 3177, R. S. 1908, and was not included in, covered or controlled by the general adjudication decree. If by their efforts they lawfully contributed water to the stream which otherwise would not have reached it above their headgate, it was theirs, independent of the original

adjudication decree, and because by their labor they contributed extraneous water to the normal flow, is no reason why they may not sell their priorities, and irrigate their land with the independent water. The right to protect and preserve their individual ownership in property authorized them, when their priorities were taken from them, and they were threatened with the loss of their ranches and crops, to procure water from any independent source, and because they were put to this additional labor and expense to save themselves, is no reason why they should suffer the further loss of their priorities. The result of such a construction would be disastrous to individual enterprise and activity. Suppose an enterprising ranchman takes stock in a company constructing a mutual reservoir, and finds when it is completed that it supplies him with sufficient water to irrigate his farm. May he not sell his priority, or must he pay a penalty for being public spirited and lose his water rights? Suppose under the seepage statute one drains part of his own lands, and develops water sufficient to irrigate the remainder, may he not sell his water right, and use the developed water, or must he as a penalty for reclaiming his land lose his water right?

In *Strickler v. Colorado Springs, supra,* the court said that if the soil of one's farm should wash away so he had no further use for the water, this was no reason why he should also suffer the loss of his priority of right in and to the use of the water, and that he could sell the water right to be used elsewhere. It has also been held that where one has lost the use of his land from seepage that that is no reason why he should also lose his water right, and that he could change it to other lands himself, or sell it to another, who would have the right to change it to other lands.

In *King v. Ackroyd, supra,* King's land became so seeped that it had no further need of irrigation; but we held that she did not thereby lose her water right, but could sell the water that was used on the seeped land to other parties, to be used on their lands. If the Eggleston,

and the Feeder ditch had not been built the seepage they collected never could have become a part of the river above 2 and 3 ditches. This water was not an accretion that had entered the river subject to the decree to supply all the priorities in their numerical order, but was independent water procured from an extraneous source, and belonged to the owners who produced it and put it into the river.—*Ripley v. Park,* 40 Colo. 129, 90 Pac. 75, *Platte Valley Co. v. Buckers,* 25 Colo. 77, 53 Pac. 334.

In the *Buckers case, supra,* it is held where a party by his own efforts and expenditures has increased the flow of water in a natural stream, he is entitled to use the water to the extent of the increase. The same principle is again announced in the *Ripley* case, *supra,* where the court, through Mr. Justice Campbell, in speaking of the doctrine announced in the *Buckers* case says: "We have held that such contributions to a natural stream belong to the one who made them."

Protestants may have acquired a vested right in and to the water of the stream, that any seepage into the river below the Boles & Manney headgate should continue to supply priorities 2 and 3 at the old point of diversion; but they did not acquire a vested right in and to the water of the stream, that a subsequently acquired independent water right which augmented the normal flow should become a part of the original decree and supply 2 and 3 priorities. Neither did they acquire a vested right in and to the water of the stream, that the senior priority owners would not subsequently acquire water from some extraneous source, and sell their priorities.

The seepage used by No. 2 was of the same character, except instead of emptying it into the river above its headgate it was turned into the ditch some distance below its headgate. There was no use of putting the water into the river to get it into No. 2 as No. 3 had done, because the Eggleston was on the west side and No. 3 was on the east side of the river.

4. Does the evidence sustain the finding of the court, that the change was a benefit and not an injury to the

vested rights of others in and to the use of the water of the stream? The evidence on this point is too voluminous to more than state its general effect. The testimony of the water officials who had investigated and studied the conditions on the river for a number of years, was to the effect that in times of scarcity this 18 feet of early priority water could only be delivered to 2 and 3 headgates by sacrificing a great portion of the 40 or 50 feet passing the Montrose canal as well as the accretions into the river below Montrose. In fact, when they attempted to do so by keeping closed all the headgates, it practically consumed the accretions below Montrose. With the water transferred into the Montrose canal this loss by sinking and evaporation is saved to the river. The priority of the Montrose canal is so late, and the chances of getting water in times of scarcity so uncertain, that the business of farming and fruit raising on the mesa was retarded and precarious; but the transfer of this early water into the canal increased the irrigated acreage, and the use of flood waters. Of the water used on the mesa it is estimated from 60 to 70 per cent returned to the river below the dry bar and above the mouth of Spring creek, and was used by the protesting ditches, and none of it was permitted to reach 2 and 3 headgates. In other words the protesting ditches had the use of all the increased accretions into the river, which were greatly augmented by these transfers. As a result, priorities 1½, 4, 5, 6, 7 and 8 are supplied by the return waters largely produced from the effect of the transfers, and No. 9 above the dry bar is supplied by the saving to the river on account of the change in the point of diversion. There is evidence that it would take 60 to 70 feet of river water at the Montrose canal headgate, and consume the accretions below Spring creek, to deliver this 18 feet into 2 and 3 headgates. Whether this statement is true or not, we think the evidence clearly shows that the change in the point of diversion is a benefit to every one. Whatever accretions there may be, if any, into the river between the Boles & Manney and No. 2 headgates are so small

that they are more than offset by the general benefit.

*Crippen v. Glasgow,* 38 Colo. 105, 87 Pac. 1073, was a proceeding to change the point of diversion of 4 feet of priority water to a point further up the stream. The lower court found it would require a flow of 14 feet in the bed of the river to deliver 4 feet down the stream into the headgate at the original point of diversion, while it would only require 4 feet from the river to deliver the 4 feet up the stream into the canal at the new point of diversion; that this saving to the river of 11 feet, together with the additional accretions from seepage, caused by applying the transferred water to the lands under the ditch, at the new point of diversion, was beneficial, and more than compensated any loss to the land owners between the two points of diversion. For this reason it held that any vested right of intervening appropriators in and to the use of water between the new and old points of diversion would not be injuriously affected on account of the change, and the finding was sustained by this court.

The protestants say they have no intention of causing this waste by forcing these early priorities down to 2 and 3; they do not want the water to go there; they want it themselves. Viewed from this aspect of the case, why should protestants, who do not own the water, be given it in preference, to prevent waste, to those who own it, and have transferred it into the Montrose canal, which prevents the waste. If preferences are to be shown or given to anyone to prevent waste, it would seem the use, if it is practicable, should be given to the owner.

We are of the opinion that the finding of the court is right and is sustained by the evidence.

*Affirmed.*

Chief Justice Musser and Mr. Justice Gabbert concur.