No. 9231.

RIO GRANDE RESERVOIR AND DITCH CO. v. WAGON WHEEL GAP IMPROVEMENT CO.

1. WATER RIGHTS—*Abandonment.* The mere expressed intention to abandon a right in water is without effect to deprive the owner so expressing himself.

2. ——*Seepage*, escaping from a reservoir is part of the stream from which it was diverted. It is regarded as already appropriated by those having adjudged priorities and is not subject to appriation.

3. In *Ironstone Ditch Company v. Ashenfelter*, 57 Colo. 31, the only question for decision was whether the proposed change would

injuriously affect vested rights to the use of water from a particular stream. Expressions of the opinion upon other questions declared *dicta*.

4. ADJUDICATION OF PRIORITIES—*Decree.* Doubted whether a decree for direct irrigation can be granted in a proceeding to secure storage rights.

5. ——*Discriminations—Relief.* The court below having denied the benefit of the doctrine of relation as to plaintiffs in error, who were shown to be entitled to it, the decree was reversed with specific directions to the court below to allow the several appropriations claimed by plaintiff, and the date and volume of each.

As to the affirmance of the decree disallowing a decree for direct irrigation, Garrigues, C. J., and Burke and Denison, J. J., dissent.

*Error to Costilla District Court, Hon. A. Watson McHendrie, Judge.*

Mr. JESSE STEPHENSON, Messrs. GOUDY, TWITCHELL & BURKHARDT and Mr. FRANK B. GOUDY, for plaintiff in error.

Mr. J. T. ADAMS, Mr. EZRA T. ELLIOTT, Mr. CHARLES M. CORLETT and Mr. GEORGE M. CORLETT, for defendants in error.

Mr. JAMES W. MCCREERY, Mr. DONALD C. MCCREERY, Mr. STOTTON R. STEPHENSON and Mr. HARRY N. HAYNES, Amici Curiae.

Mr. Justice Bailey delivered the opinion of the court.

PLAINTIFF in error, The Rio Grande Reservoir and Ditch Company, was awarded certain priorities for 43,565.06 acre feet of water for storage purposes in the Santa Maria reservoir in an adjudication proceeding in Costilla County. At the same time other awards were made to the several defendants in error, all of prior date to that of plaintiff in error. In the same adjudication plaintiff in error was denied a decree for an original appropriation for direct irrigation, for the Santa Maria Seepage Ditch, and brings the record here for review on both propositions.

The matters for determination are, whether upon the evidence the date of the decree awarded to the Santa Maria Reservoir should have been earlier, and whether the capture of the seepage water by the Santa Maria Ditch can be regarded as such an original appropriation as to entitle it to a decree antedating all other appropriations for water for direct irrigation on the stream to which such seepage is plainly tributary.

Upon the first question it appears that the Santa Maria reservoir was originally a small lake, the basin surrounding which was surveyed by one Thorne in August, 1896, for the purpose of locating a reservoir site. The Rio Grande Reservoir & Ditch Company was then organized and a map and statement prepared for it by Thorne was filed in accordance with the federal act of 1891, for the purpose of obtaining a right of way over public lands.

By this map and statement the reservoir company claimed a reservoir capacity of 15,971.2 acre feet, which claim was lodged with the State Engineer on October 8, 1896. On December 5, 1896, the company was notified by the Secretary of the Interior that approval of the filings would be held in abeyance because of international complications with Mexico in relation to the diversion of water from the Rio Grande river in New Mexico and Colorado. At this date the company had expended over $4,000.00 in preliminary preparations and construction. It continued to expend money on the project, and to do, everything that could reasonably be done in the absence of a right of way across the public domain, to protect and perfect its claim.

In 1901 the company determined to increase the capacity of its reservoir, and until November, 1907, when its application for the right of way was approved, it constructed ditches, built a dam, made numerous surveys for its inlet ditch, and in other ways expended upon the project, while the approval of its application for the right of way was pending, approximately $12,000.00.

An amended map and statement was filed in the office of the State Engineer, in August, 1906. Work of some

kind was done upon the project in 1907, 1908 and 1909, and in October, 1911, water was turned into the reservoir, which was used in 1911 upon lands to a total amount of 4,800 acre feet. In 1913 the amount so stored and used was 9,600 acre feet. In November, 1913, the reservoir was completed to its full capacity.

It is claimed that the court in its decree failed to give this company the benefit of the doctrine of relation, although that doctrine was applied in behalf of all other claimants. It is urged that upon the evidence the company's priority should bear date as of August 7, 1896, the time of the original survey by Thorne. The record substantially supports the contention of the company that the decrees awarded defendants in error, of date superior to its decree, are based upon less evidence of work done, money expended and diligence employed, than that upon which it relies. It is urged that the provisions of section 3284, R. S. 1908, requiring the consideration of the diligence with which the work was in each case prosecuted, the nature of the work as to difficulties encountered, and all such like facts tending to show compliance with the law, in securing the priority claimed, was disregarded as to this complainant, but recognized as to all the others, and that the court utterly ignored the natural difficulties connected with the project, and the delay occasioned by the federal authorities in granting the right of way, when it determined that due diligence had not been exercised by the company in putting the water to a beneficial use.

It conclusively appears that work was done or money expended by plaintiff in error in this property in every year from 1896 until 1909. During all but two years of this period the project was held in abeyance by federal order. The other reservoirs to which senior priorities were awarded were found to have exercised due diligence up to the time of their respective approval by the Department of the Interior, although their claim of diligence is supported by testimony identical with that offered by plaintiff in error in support of its claim. The trial court,

however, applied the doctrine of relation to them, and refused it as to plaintiff in error, giving it a priority as of July 10, 1910, instead of August 7, 1896.

From the brief of defendant in error it appears that the findings complained of were based on a certain letter written by the manager of several of the reservoir companies, but not of the one which owns the Santa Maria reservoir. The letter purports to show that the companies for which the writer was manager had abandoned the idea of constructing the reservoir, and from the testimony of the writer and of others it appears to have been written to mislead rival companies as to the true intentions of plaintiff in error, with a view to obtaining land needed for the Santa Maria reservoir at better prices. It can not, however, in any way bind the plaintiff in error, because it at all times diligently continued work on the project, and on the reservoir site referred to in the letter. Under the law an expressed intention to abandon does not cause forfeiture of rights unless possession is relinquished and acts of ownership cease. The letter, therefore, is not sufficient to justify the conclusion reached by the trial court that plaintiff in error had once abandoned the property and returned to it again in 1910.

As to the denial of an original appropriation for direct irrigation for the Santa Maria seepage ditch it appears that after the Santa Maria reservoir was filled seepage water therefrom appeared at the base of one of the adjacent hills. The ditch in question was then constructed, such seepage water captured and measured over a weir. It was sought to appropriate this seepage water and conduct it by ditch to the gates of a canal belonging to the company far down the stream and there apply it to lands under that system, for direct irrigation purposes. The right is based upon the theory that the waters having been impounded in the reservoir during the winter months when direct irrigation is impossible, have not been and could not have been appropriated for direct irrigation. *Iron Stone Ditch Company v. Ashenfelter,* 57 Colo. 31, 140 Pac. 177, is relied upon as authority to support this contention.

The question involved, as we view it, has been definitely settled against this contention in *Comstock v. Ramsay*, 55 Colo. 244, 133 Pac. 1107, where this court makes the following announcement under conditions similar to those involved in this case: "We take judicial notice of the fact that practically every decree on the South Platte River, except possibly only the very early ones, is dependent for its supply, and for years and years has been, upon return, waste and seepage waters. This is the very thing which makes an enlarged use of the waters of our streams for irrigation possible. To now permit one who has never had or claimed a right upon or from the river to come in, capture, divert and appropriate waters naturally tributary thereto, which are in fact nothing more or less than return and waste waters, and upon which old decreed priorities have long depended for their supply, would be in effect to reverse the ancient doctrine 'First in time, first in right', and to substitute in its stead, fortunately, as yet, an unrecognized one, '*Last* in time, first in right.' *   *   *

"Every appropriation of water on this stream, claimed and decreed for irrigation purposes, has been so claimed and decreed upon the theory that all waste and seepage water arising from the irrigation of land, or from the construction and maintenance of reservoirs using water from the river, and naturally returning to it, is available to supply such appropriations and decrees. To now permit independent appropriation and diversion of these waters in a way to adversely affect prior appropriations and decrees is in direct conflict alike with the spirit of the law under which such priorities have been decreed and the practical purposes for which these appropriations have been made and recognized. It is a well known fact that practically all appropriations down the stream are dependent on return, waste and seepage waters for their supply. If a part of these waters may be cut off, then all of them may be, with the result that the stream might thus be wholly depleted, and all appropriations and decrees, no matter how early, below the points where such waters are diverted,

would be stripped of their rights and rendered useless and of no practical worth or value.

"There is no law anywhere to support the contention that if these waters are naturally tributary to the river, still they may be taken by a new claimant to the damage and injury of prior appropriators upon that stream, simply because he captures and diverts them before they actually get into the river channel. If such act of capture and diversion can be upheld as lawful and proper, by the same reasoning a new claimant could divert the waters of a surface tributary, if he only be spry enough to capture and divert them before they actually reach and mingle with the waters of the main stream. When it is shown or admitted that these waters ultimately return to the river and thereby augment and replenish its flow, they are  *  *  *  as much a part thereof as when they actually reach the stream. Whenever these waters start to flow back to the river and it is apparent that they will reach it, they constitute a part of the stream and are not subject to independent appropriation as new or added water, or because they have been used to serve one priority and have been thus artificially brought into that position."

This rule was followed and approved in *Trowel Land & Irrigation Co. v. Bijou Irrigation District,* 65 Colo. 202, 176 Pac. 296, in the following language: "The law makes no distinction as relates to the return of water to the stream between that from a reservoir supplied by a natural stream, or from a ditch supplied directly from the stream, regardless of the fact that the reservoir may be chiefly supplied in time of high water, or in the non-irrigation season.

"In the Ramsay case, the seepage water involved escaped water both from a reservoir and ditch, and it was there said, speaking of the identical stream here involved: 'Every appropriation of water on this stream, claimed and decreed for irrigation purposes, has been so claimed and decreed upon the theory that all waste and seepage water arising from the irrigation of land, or from the construction and maintenance of reservoirs using water from the

river, and naturally returning to it, is available to supply such appropriations and decrees."

That part of the opinion in *Iron Stone Ditch Co. v. Ashenfelter, supra,* quoted by plaintiff in error in support of its contention, is purely gratuitous and volunteer matter, and not responsive to any issue in that case. This is plainly apparent since the proceedings there brought were to change the point of diversion of certain appropriations, and the only question for decision, and the only point which could have been properly decided, was whether the proposed change would injuriously affect vested rights to the use of water from that stream. The dictum relied upon cannot be held to overrule former decisions of this court, nor do we think there was any purpose or intention to do so. In any event, the matter in this opinion relied upon can be considered only as the individual opinion of a single justice of this court, and of course, while persuasive, can in no sense be held to be the opinion of the court, much less can it be accounted as overruling our decisions which distinctively declare a different rule.

There is not, neither can there be, any question in this case of newly developed or added water, which subject presents a different question from the one actually involved, so that any such discussion is futile and wholly beside the case, since the seepage water under consideration, on the evidence adduced, is manifestly tributary to the Rio Grande river, from which stream the Santa Maria reservoir secured its storage appropriation. To permit the recapture of the seepage water from such reservoir, while on its way back to the river to which it is tributary, and allow it to be applied to land many miles down the river, under a claim of original appropriation for direct irrigation, prior in time to all other appropriations on the stream, would plainly constitute a wrongful use of water by the reservoir company, and would completely overturn the doctrine, so firmly etablished in this jurisdiction, that prior appropriation and use give the first and better right. *German Ditch & Reservoir Co., et al. v. Platte Irrigation Co.,* 67 Colo. 390, 178 Pac. 896.

It is easy to see how decrees for seepage water for direct irrigation, if made subject to vested rights, may properly be allowed, and that such decrees might at times and under certain conditions prove most beneficial, but it is equally plain that, under a system of re-appropriation of seepage and return waters indefinitely carried on, awarding priorities antedating all others on the stream, the value of old rights might be not only greatly impaired, but utterly destroyed.   Moreover, this proceeding was brought to obtain a decree for storage rights only, and it is of doubtful import whether in any event a decree for direct irrigation could properly be allowed in such action.

The findings and decree of the trial court will be reversed as to the date of the appropriation awarded plaintiff in error for storage in the Santa Maria reservoir and the cause remanded with directions to the court below to modify the decree and award plaintiff in error a storage capacity as of August 11, 1896, for 15,871.21 acre feet, of which 9,600 feet is absolute; also a priority as of September 22, 1902, for 27,954.85 acre feet, which together with the remainder of the August 11, 1896, priority, is conditional.   That part of the decree denying an appropriation of seepage water to the Santa Maria seepage ditch for direct irrigation, antedating all other direct irrigation decrees on the stream, is affirmed.

Decision *en banc.*

On the reversal of the judgment as to date of the reservoir priority, all concur.   On the affirmance of the disallowance of a decree for direct irrigation, the Chief Justice and Mr. Justice Burke and Mr. Justice Denison dissent.

Affirmed in part and reversed in part.

Garrigues, C. J., dissenting.

It is manifest that the rights of plaintiff in error depend upon whether the water in question is a tributary and a part of the flow of the river.   The majority opinion can only be sustained upon the assumption that it is a tributary and belongs to the natural flow of the stream.   I think, under the evidence, that the disputed water is extraneous to the

natural or regular flow of the stream, which was only being used as a conduit. Plaintiff does not claim a priority, but seeks recognition from the court and water officials of its rights to the water and the use of the stream as a conduit for its distribution. The majority opinion denies this right and holds that it will destroy the value of old ditch priorities. From this part of the opinion I dissent.

The majority opinion is based upon *Comstock v. Ramsay,* 55 Colo. 244. The law as announced upon the statement of that case necessary for its decision is undoubtedly correct, and has always been the undisputed rule in this state; no one claims the contrary, although there are some expressions and dicta in that opinion which might have been omitted with propriety. It in fact decided but one point, namely, that a junior appropriator cannot divert the water of a tributary to the detriment of a senior upon the main stream. The court in that case, at page 256, says: "What and all we do intend to here determine, on this particular point, is that where it appears that such waters are in fact tributary to the stream, and form a substantial and material source of its supply, upon which appropriators therefrom have long depended for water to satisfy their priorities, that then, as between such *bona fide* appropriators and users of such waters and a new claimant, the former has the first and better right."

With that I think every irrigation lawyer in Colorado can agree. No one claims here that a junior appropriator can take the water of a tributary to the detriment of a senior upon the stream. What I deny in this case is that the impounded water flowing in this seepage ditch at the base of the dam ever became, under the facts and circumstances of this case, a natural watercourse, or a part of the natural flow, or a tributary of the river.

I lay down, as the first point in the discussion, that water which one has saved, developed or produced, or which comes from an independent or extraneous source to the natural irrigation flow of the stream, and has been put into the river as a conduit by the producer or owner for

the purpose of taking it out and using it lower down the stream for irrigation, belongs to the one who put it into the stream as against all priorities; or, put in a way already expressed by this court, one who by his own efforts, increases the natural flow of a stream either by *saving* or developing water is entitled to its benefit to the extent of the increase as against all consumers, regardless of priority. The right is not based upon priority, and the stream is only used as a canal or conduit. This rule is sustained without an exception by every authority in every irrigation state. *Platte Val. Irr. Co. v. Buckers Irr. M. & I. Co.*, 25 Colo. 77; *Ripley v. Park Center L. & W. Co.*, 40 Colo. 129, 133; *Ironstone D. Co. v. Ashenfelter*, 57 Colo. 31, 42, 43, 44; *McKelvey v. N. S. Irr. Dist.*, 66 Colo. 11, 179 Pac. 872; *Churchill v. Rose*, 136 Cal. 576; *Pomona L. & W. Co. v. San Antonio W. Co.*, 152 Cal. 618, 623; *Miller v. Wheeler*, 54 Wash. 429; *Schulz v. Sweeny*, 19 Nev. 362. Our statute expressly confers this right to the use of the stream.

In the Buckers case, 25 Colo. 77, it is expressly held that one who increases the average continuous flow of a stream by his own energy and expenditure is entitled to the increase, and the use of the stream as a conduit, as against all other consumers on the stream, regardless of their priority. This case has never been modified unless it was intended to silently overrule it in the Ramsay case. It has often been followed and quoted in other states and is authority that one is entitled to the increase to the natural flow which he put into the stream with the intention of taking it out for irrigation use. The three Buckers cases, 25 Colo. 77, 28 Colo. 189, and 31 Colo. 62, involve the same water. Beaver lake was an old bed of the river and Beaver brook was its outlet, and adjacent sloughs caused by seepage from irrigation were the source of supply of Beaver lake and of Beaver brook, the latter being a natural watercourse and a tributary of the Platte river. The Buckers company constructed Beaver lake ditch, a seepage drain ditch, which intercepted and diverted the water from Beaver brook. It claimed the use of the water as against

prior appropriators upon the main stream (the Platte river) upon the theory that it had developed the water by draining adjacent lands, and had thus increased the natural flow, and was entitled to the increase. The lower court found on the first trial (reported in the 25th Colo.) that Beaver brook was a natural watercourse, and that the Buckers company had increased its natural flow by the drainage of seepage lands adjacent thereto, and therefore was entitled to *all* the water flowing in Beaver brook. Mark the word "all". The case was brought here and reversed upon the ground that the court erred in giving the Buckers company *all* the water of Beaver brook. We held, Beaver brook being a natural watercourse and tributary of the Platte river, the company was not entitled to *all* the water as against senior appropriators, but expressly held that it was entitled to the use of the water in dispute *to the extent that it had increased the natural flow*. The error of the lower court specifically pointed out, and, for which the case was reversed, was in giving it *all* the water, both that which it claimed to have developed as well as the natural flow of the stream. For this error the judgment was reversed and case remanded and a retrial had which was reviewed by us and reported in the 28th Colo. where, at page 189, it is said: "From this judgment (that is the former judgment giving defendants all the water) the plaintiff appealed to this court, where, upon consideration of this branch of the case it was held that the court erred in decreeing the present appellants (the Buckers company) all the water from this source, because they were only entitled to the water flowing from Beaver lake to the extent they had increased its average continuous flow." So, we see, in the 28th Colo. we expressly reaffirmed the rule theretofore so strongly pronounced in the 25th Colo. In the syllabus in the 28th Colo., at page 187, it is said, in speaking of the case in the 25th Colo.: "The appellate court sustained the lower court to the extent that such junior appropriators (the Buckers company) were entitled to the increase of water they had caused to flow in the

stream, but reversed the judgment because it decreed them *all* the water in the stream instead of only the increase and the cause was remanded for a new trial," for this reason. On the third trial over the same water the lower court found on conflicting evidence that there had been no increase of the natural flow; that the apparent increase was only a concentration of the water present in the sand and gravel, forming the natural channel, and the banks adjacent thereto; that the Buckers company had added no water to the natural flow, but had simply intercepted the natural surface flow in the channel, and the water saturating the sand and gravel constituting the bed and banks of the channel, which amounted to a diversion of the surface and subterranean flow of the natural stream; that, for this reason, the water they claimed to have developed, was not an increase, but was in fact taken from the stream itself. This finding of the lower court was affirmed in 31 Colo. 62, but it accentuates the rule theretofore announced and in no way abrogated, modified or changed the former decisions. The case adheres to the rule of law announced in the two former cases, that one who increases the natural flow of a stream is entitled to the increase.

Where one, by his own energy and expenditures, with the intention of using it for irrigation, adds to the natural flow of a stream, it does not become a part of the natural flow and such water though commingled, to distinguish it from the natural flow, has been given various names by the courts, such as, "the increase," "independent water," "artificial water," "developed water," "saved water," "excess water," "new water," "free water," "water from an extraneous source," "artificial accretion," etc., but whatever the name, and whether saved water or developed water, it is universally held in all the irrigation states, that the one saving or developing it and adding it to the stream has a right to its use, and the use of the natural stream for its distribution, and to divert therefrom an equivalent amount for irrigation. This principle was announced by the Supreme Court of California as early as *Butte Co. v.*

*Vaughn,* 11 Cal. 143. In *Creighton v. Kaweah C. & I. Co..* 67 Cal. 222, it is said: "At best the plaintiff would be entitled only to have the defendant enjoined from obstructing the flow of that which would have naturally flowed, unaided by artificial means, with which the plaintiff is not connected."

The mater is fully discussed in *Wiggins v. Muscupiabe L. & W. Co.,* 113 Cal. 195, where the right of one to its use who either *saves* or develops water by artificial means is elaborately considered. In *Churchill v. Rose,* 136 Cal. 576, it is held that where one increases the natural flow of a creek, he is entitled to the increase as against all other appropriators. In *Pomona L. & W. Co. et al. v. San Antonio W. Co. et al.,* 152 Cal. 623, the whole matter is again reviewed, and many cases cited, and among others the Buckers case, and it is held that such water, unless abandoned, does not become a part of the natural flow of the stream, and belongs to the person causing the increase. In closing the court says, at page 624: "This same doctrine is recognized by all the courts which have been called upon to consider it."

In *LaJara v. Hansen,* 35 Colo., at page 109, it is said: "After waste waters reach the stream, unless there is then an intention by the owner to reclaim them, they become a part of its volume, and inure to the benefit of the appropriators of its waters, to be enjoyed in accordance with their numerical priorities." In *Ripley v. Park Center L. & W. Co.,* 40 Colo., at page 133, we held, that artificial water, that is water produced or developed from a source extraneous to the natural flow by the efforts of others, and put into the stream as a conduit for the purpose of taking it out and using it lower down for irrigation, belongs to those causing the increase, and is no part of the natural stream unless abandoned. In *Comstock v. Ramsay,* 55 Colo., at page 256, it is said: "When such waters leave the control of the original appropriator, having been used either for direct irrigation or reservoir purposes, without intention of recapture or further use, by him, they immediately become

a component part of the river, and cannot be lawfully diverted from their course to it by independent appropriation, to the injury of those having decreed priorities therefrom." In the present case there was an intention to recapture and further use. Of course after any water reaches the stream, unless there is an intention by the owner to reclaim it, it becomes a part of the natural flow of the stream, but what I contend is, if it was put in with the intention of taking it out and using it, it belongs to the person causing the increase.

In the fourth paragraph of the syllabus to the Ashenfelter case, 57 Colo. 31, it is said: "Whoever has developed water from a source extraneous to the stream may discharge it into the stream, and, using the stream as a conduit, withdraw it below." In *McKelvey v. North Sterling Irr. Dist.*, 66 Colo. 11, 179 Pac. 872, it is said in the first paragraph of the syllabus: "Water seeping through a dam may be recaptured (by the owner) by means of an irrigation ditch and other persons have no right to appropriate it." This is an exact parallel of the instant case, and yet no mention is made of it in the majority opinion.

In *Miller et al. v. Wheeler et al.*, 54 Wash. 429, a recent and well considered case, concurred in by the full bench, it is held, where one, by his own exertion, energy and expenditure, increases the natural flow or available supply of water in a stream, he has the right to its use to the extent of the increase, and may use the stream as a conduit for its distribution. This is a leading case and similar in many respects to the Buckers case, which it cites and follows. In that case seepage water caused from irrigation formed bogs and marshes on defendant's land, and the act complained of by plaintiff was the digging of a ditch and draining the marshes into the natural stream, which defendant used as a conduit, and taking the equivalent therefrom for irrigation as against plaintiff, a senior appropriator on the stream. At page 433, the court says, the question is: "Whether the water from this artificial source (irrigation), having naturally gravitated into the

soil, and percolating therein, may be ditched and drained for further use by the owners as against the right of a lower appropriator; in other words, whether percolating waters arising from an artificial source become a natural flow of an existing watershed and a part of its drainage stream."

The court, in answering this direct question, says, that it may or may not, according to the facts in each particular case, depending upon the question of abandonment, but the court holds that the seepage water developed by drainage in that particular case, there being no abandonment, did not become a part of the natural flow of the stream, and that the parties causing the increase were entitled to its use, as against all other consumers on the stream. No question of priority involved. It reviews many cases and upholds the universal rule that one is entitled to divert the amount he has increased the natural flow as against all prior appropriators on the stream. The artificial means of increase in that case was the drainage of lands seeped by irrigation, and the court held that this water, under the circumstances of the case, was not a natural flow of the stream, but increase. The above cases have been cited for the purpose of showing the established rule that one who increases the flow of a natural stream is entitled to the increase.

The second point is whether the conditions above mentioned are met. That is, whether plaintiff increased the natural flow of the stream without any intention of abandoning the increase.

Whether waste water escaping from a reservoir is a tributary where no tributary existed before the construction of the reservoir depends upon the facts and circumstances of each particular case. There was no abandonment of the water in this case. On the contrary, the evidence shows an intention to recapture and use the escaping water, so the element of abandonment is eliminated, and the case must be decided upon the theory that there was an intention to recapture and use the escaping water.

The evidence shows plaintiff saved and added to the stream a volume of water not theretofore wont naturally, or at all, to flow down the stream at that time and place. It diverted, stored, and saved unusued and unappropriated water which, had it not done so at the time, would have gone out of the state and been lost to everyone for direct irrigation. Hence I say it was water saved by plaintiff at a time and place when no appropriator for direct irrigation had any interest in it. For this reason, it was immaterial to those having decreed priorities of appropriation for direct irrigation what became of the water plaintiff impounded for it was saved at a time when in no event could they have used it. What I mean is, the water plaintiff saved from being lost came into the reservoir from a source extraneous to the natural irrigation flow of the stream, and the escaping water was an artificial increment to the stream over the natural flow and belongs to the one who saved it. The point I wish to make is that water saved, which would be otherwise lost, belongs to the one who saves it. I think the owner may, in constructing a reservoir, in anticipation of leakage, construct a drain ditch or ditches below the dam to recapture escaping water, and has the right to apply it to the same beneficial use as the water within the reservoir as against all appropriators on the stream when his intention to do so is manifested in due time. The water stored in a reservoir does not depend on any rule of priority except as to filling, but is water saved, and the right to its use belongs to the one who saved it.

It simply goes back to the first proposition that one who increases the natural flow by saving water that otherwise would be lost is entitled to the increase. The fact that this water was stored is proof sufficient that it would not have been saved, but would have gone down the river into the Gulf of Mexico, except for the energy and expenditure of plaintiff. No rights ever accrued to others in anticipation of this water. Its use was never available nor anticipated for direct irrigation prior to the construction of

the reservoir, and no right was ever founded upon it. It is as much saved water to which plaintiff had the right as though it had been drawn directly from the reservoir for the purpose of putting it into the stream for transportation.

It has been suggested that the water escaped from the reservoir against the will of the owner, therefore he is not entitled to recapture it. But why should that make a difference, if the intention to recapture it was the same as the intention to recapture water voluntarily released from the reservoir? It seems a strange doctrine that one cannot recapture his property that has involuntarily escaped.

In the majority opinion it is stated: "Every appropriation of water on the stream, claimed and decreed for irrigation purposes, has been so claimed and decreed upon the theory that all waste and seepage water arising from the irrigation of land, or from the construction and maintenance of reservoirs using water from the river, and naturally returning to it, is available to supply such appropriations and decrees." No doubt all decreed priorities of appropriation on a natural stream are based upon the theory that the flow of the stream and its tributaries from any source that has become an integral part of the stream shall inure to the benefit of all appropriators on the stream in the numerical order of their priorities. But I deny that any appropriation or decree is made or based upon the theory that independent or extraneous water, or water that has been saved in a reservoir, and is being conveyed for distribution, using the stream as a conduit, will inure to the benefit of any priority or to any person except the one who saved it.

In the third paragraph of the Ashenfelter case, 57 Colo. 31, it is said: "Seepage water which is being wasted is the subject of appropriation. The appropriation thereof is not included in or controlled by a prior adjudication decree in the same district."

If the majority opinion intends so to state, it is a grievous misstatement to say that prior appropriators on this stream long depended, or ever depended, upon this dis-. puted water to satisfy their priorities. It was saved to the stream long after their rights accrued.

The majority opinion states that the question is, "whether the capture of seepage water by the Santa Maria ditch can be regarded as such an original appropriation as to entitle it to a decree prior to all other appropriators on' the stream to which seepage is tributary." This does not state the question correctly. In fact, I do not see how it could be stated more incorrectly. No such claim is made and no such question is involved. What plaintiff claims is recognition of the right it already had to use the impounded water in dispute, regardless of priorities, upon the theory that it is excess or increase which it produced and put into the stream without any intention of abandoning, but as a conduit for transportation, with the intention of taking it out and using it lower down for irrigation.

The majority opinion further states: "If such act of capture and diversion can be upheld as lawful and proper, by the same reasoning a new claimant could divert the waters of a surface tributary, if he only be spry enough to capture and divert them before they actually reach and mingle with the waters of the main stream." This is begging the question. Plaintiff is not diverting the water of a tributary, or claiming the water by virtue of priority of appropriation. It only asks the right to take the increase it saved and put into the stream. It asks no part of the natural flow. This water is not a tributary in the sense that it is a part of the flow of a natural stream. All that plaintiff needs or seeks is recognition by the police officers on the stream of its right to the use of the water it saved, and the use of the stream as a conduit, and it is proper that the courts should grant such recognition in an adjudication proceeding, as a guide to the water officers. This course was pursued in *McKilvey v. N. A. Irr. Dist.*, 179 Pac. 872. I think the case should be reversed

and remanded to the lower court to enter a decree in the adjudication proceeding in accordance with the views I have herein expressed.

Denison, J., dissenting.

I dissent from the opinion of the majority and concur in that of the Chief Justice.

For convenience in this discussion, I shall use the term "direct supply" as equivalent to "that part of the water of the stream available for direct irrigation."

The statement in the majority opinion that the question before us is: "Whether the capture of the seepage water by the Santa Maria ditch can be regarded as such an original appropriation as to entitle it to decree prior to all other appropriators on the stream to which such seepage is tributary" is inaccurate.

The water in question is not ordinary seepage and conclusions based on the theory that it is so will be unreliable, and the principal question is not whether the capture of it is a valid appropriation, but whether the owner of the reservoir from which it has escaped has a right to it without appropriation.

It is either mere leakage from the reservoir or else it is an accretion or addition to the direct supply. It must be either one or the other, because it was not there before the reservoir was filled. If it is not mere leakage it may perhaps be called seepage but in that case it must be an accretion or addition to the direct supply, because, since no portion of the direct supply can be lawfully used to fill the reservoir, it follows that all the water, the winter water, for instance, put into the reservoir and released in the irrigation season, must, with mathematical certainty, be an addition to the direct supply.

I think this water is leakage. True, some of it comes through a ridge, a natural barrier, but that is essentially a dam and is used by the constructors of the reservoir as a part of their dam. Even if it were not a part of the dam, nevertheless, when reservoir water escapes it is leakage, and if so, and if it can be identified as from the reser-

voir, it of right ought to be and is, certainly, the property of the owner of the reservoir as much after it escapes as before—until he abandons it. If the water in the reservoir is his and escapes against his will, and he has not abandoned it, how does it cease to be his?

If he may retain the leakage by a cement lining on the inside of his dam, why not by a cement retaining wall on the outside of it, It is as if he had it in a tub out of which it leaked and he caught it in a pail.

If not leakage it is an accretion or addition to the stream and as such belongs to him who created the addition, as shown in the opinion of the Chief Justice.

## On Petition for Rehearing.

Per Curiam:

The sole question determined as to seepage water is that no decree, on the facts of this case, for an appropriation thereof by the reservoir company, for direct irrigation, antedating all appropriations from the river for like use, can lawfully be awarded. No other question, upon the subject of seepage, has been presented, considered or adjudged herein.

Rehearing denied.