## No. 8756.

### TROWELL LAND AND IRRIGATION COMPANY v. BIJOU IRRIGATION DISTRICT, ET AL.

1. WATER RIGHTS—*Adjudication of Priorities—Special Proceeding.*

   An appropriator who is diligently proceeding to complete an incohate right to the use of water is not required to assert his claim in a special proceeding, instituted by another appropriator solely to adjudicate his own right.

2. —— *Conditional Decree,* awarding to the appropriator a specified volume of water, without prejudice to a larger appropriation, upon evidence of the future application of the increased volume to beneficial uses, within a reasonable time, approved. The right of the appropriator to the increased volume upon compliance with the decree relates to the beginning of his work.

3. —— *Delays in the Application of the Water to Beneficial Uses.* Where the junior appropriator asserts that by delays in the completion of his works, the senior appropriator has lost his priority he must show that his own appropriation was initiated, and work commenced thereunder, during such delays.

4. —— *Relation.* Where even after inexcusable delay in the work of applying the water to beneficial use the appropriator resumes work before the right of any third person has intervened, and proceeds diligently to its completion and use, his right relates to the initiation of his appropriation.

5. —— *Limitations.* The Limitations prescribed by Rev. Stat.

secs. 3313, 3338 apply only against a final and absolute decree.

6. —— *Abandonment—Effect.* An abandoned ditch which collects seepage and conveys it to the stream is regarded as a natural water course.

7. —— *Officers of the Water Service—Jurisdiction to Control.* The District Court of one county has no jurisdiction to control the officers of the water service in the administration of a ditch located in another county, when the ascertainment and determination of the priorities therein is vested by statute in the District Court of such other county.

8. —— *Seepage Water.* The doctrine of Comstock v. Ramsey, 55 Colo. 244, is not confined to the case where the seepage in question has not yet reached the stream. It extends to escaped water which will naturally, and in the course of time reach the stream from which it was diverted.

9. —— *Reservoirs—Right of Owner as to Seepage therefrom.* The owner of a reservoir may construct a ditch and drain the lands which the seepage from his works has injured but this confers no right to the seepage, if the water so collected may naturally return to the stream.

And the owner of a reservoir who contributes to the construction of a ditch for the collection of his seepage, merely to avoid an action by the owner of lands damaged thereby acquires no right in the seepage so collected.

*Error to Weld District Court, Hon. Robert G. Strong, Judge.*

Messrs. GOUDY, TWITCHELL & BURKHARDT, Mr. H. R. KAUS, for plaintiff in error.

Mr. JAMES W. McCREERY, Mr. DONALD C. McCREERY, Mr. ROBERT M. WORK, Messrs. STEPHENSON & STEPHENSON, for defendants in error.

Mr. Justice Scott delivered the opinion of the court.

In a general adjudication of priority rights to water for irrigation purposes in Water District No. 1, in the District Court of Weld county, entered on the 1st day of November, 1895, the Fort Morgan Land and Reservoir Company, predecessor to the defendant in error, The Bijou Irrigation District, was awarded a decree for 125 cubic feet of water per second of time, as of priority date of October 1st, 1888. These waters were from the South Platte river.

The provision contained in the decree, material here, was as follows:

"Said ditch since its construction not having as yet been used to its full capacity for the irrigation of the lands thereunder, and only a portion of the lands lying under said ditch and intended to be irrigated there from having as yet been irrigated. And it is hereby ordered, adjudged and decreed that there be allowed to flow into said ditch from said stream, for the benefit of the parties entitled thereto, at such times as the same may be needed for the irrigation of lands thereunder, under and by virtue of appropriation by construction of said ditch, and the diversion and use of water thereby, and on Priority No. 41, as aforesaid, one hundred and twenty-five (125) cubic feet of water per second of time, without prejudice to the rights of said ditch or the owners thereof to have adjudged to it a larger appropriation of water under said priority upon further and additional testimony as to the appropriation and use of a larger amount of water thereby, within a reasonable time."

In a special proceeding and upon petition of Charles J. Cooper, predecessor of The Trowel Land and Irrigation Company plaintiff in error, a decree was entered in said court on July 14th, 1904, granting to The Trowel Ditch a priority which was numbered 49, for 90 second feet of water, of priority date of December 27, 1900, and at the same time denying the claim of said ditch to 15 second feet of water claimed as an overflow right. All parties here appearing at that time interested in the appropriated waters from the stream, were made parties to the latter proceeding; a referee was appointed and all parties including the defendant in error and its predecessors were duly notified, and appeared at the hearing, both before the referee and the court.

In that proceeding the Bijou company nor its predecessors made claim of right for additional priority to that awarded by the decree of 1895. The Broad Run Investment Co., predecessor to The Trowel Company appealed to this court from that part of the decree which denied its claim

to the 15 second feet as an overflow water right.    The judgment of the District Court was affirmed.    *Broad Run Investment Co. v. Deuel & Snyder,* 47 Colo. 573.

This proceeding is one in general adjudication of the water rights of District No. 1, in the said Weld County District Court, instituted January 5th, 1909, and the claimed priorities of the plaintiff and defendant in error only, are here involved.    The Bijou Irrigation Company, claimant of the Bijou ditch and canal, filed its statement of claim for 450 cubic feet of water per second of time claiming priority as of October 1st, 1888, the date of its former decreed priority, and an additional 85 cubic feet per second of time, as an enlargement, as of date of April 1st, 1900.    The 450 second feet so claimed was to include the 125 granted under the decree of 1895.

By the decree now under consideration the court allowed the claim of The Bijou Company for 450 second feet including the 125 feet allowed by the decree of 1895, as of date of October 1st, 1888, and an additional 50 cubic feet per second as of priority date of April 1st, 1900, under its claim of enlargement.    It will be noted that these priorities antedated the Trowel ditch priority of date of December 27th, 1900, for 90 cubic feet under the decree of 1904.    The court further renumbered the Trowel ditch priority, making it No. 56, instead of No. 49, as fixed by the original decree.

The claim of the Trowel ditch was and is, that it is entitled to a priority of 90 feet as of date of December 27th, 1900, superior to the claim of the Bijou ditch, excepting only the 125 cubic feet awarded that ditch by the decree of 1895.    The Trowel ditch also claims a priority under the Shoemaker Seepage Ditch, which will be later considered.

It is the contention of the plaintiff in error that in this general adjudication proceeding it was improper to assail its decree of 1904, for the reason that both the two and four year statutes of limitation had elapsed prior to the institution of the proceeding; that the proceeding of 1904 was regular, and was sustained by this court in the Broadrun

case and therefore the doctrine of *res adjudicata* must apply.

The Bijou Irrigation Company on the other hand contends that the decree of 1904 was a special proceeding; that it was a proceeding for the adjudication of the rights of the Trowel Ditch only, and that no general notice was given to all priority holders in the district to come in and make proof of their claims, and that it was entitled therefore to come in and "have adjudged to it a larger appropriation of water under its priority, decreed in 1895, upon further and additional testimony as to the appropriation and use of a larger amount of water thereby, within a reasonable time," as provided in its original decree.

The real question here is, what are the priority rights of the Bijou Company, to the water decreed in this proceeding, by relation to the decree of 1895, and are such rights prior and superior to these decreed to the Trowel Company by the intervening decree of 1904. The decree of 1895 gave the Bijou ditch 125 cubic feet per second of time as of date of October 1st, 1888. It is conceded that to this extent, the decree is absolute and is not to be disturbed.

Counsel for the Trowel Land and Irrigation Company say that the contention in behalf of that company is in no sense an attack upon the decree of 1895. That the attack is upon the award in the present proceeding to the Bijou ditch, of the 325 feet as additional to, and part of, the awards of 1895 decree, and the dating thereof as of the date of the award in that decree. Also upon the award of 50 feet additional by reason of the enlargement as of date of April 1st, 1900.

In the adjudication proceeding now under consideration, the court found in substance that the owners of the Bijou ditch and their predecessors in interest:

"Within a reasonable time after construction of its original capacity and continuously since, the full amount of 450 cubic feet was diverted when supply was available, and was applied to irrigation of lands. Work of construction

upon said enlargement was begun April 1, 1900, and was completed with due diligence within a reasonable time and continuously since, whenever supply was available, there has been diverted by said enlargement and applied to irrigation of lands the amount of 50 cubic feet of water in addition to that diverted by its original size. The amount of land to which water has been applied by this ditch is 38,400 acres. There is served by this ditch and by Bijou No. 2, and Empire Reservoirs, the total amount of 50,000 acres of land which lie under this ditch, and are susceptible of irrigation from it.

The volume of water appropriated from the South Platte River by original construction and use of said ditch is the amount of 450 cubic feet per second; said appropriation took effect October 1, 1888. The ditch priority No. 41 awarded this ditch conditionally in the decree in the case No. 433 should be made final for the amount of 450 cubic feet per second, to date from October 1, 1888. This is the entire amount of said priority.

By said enlargement claimant has appropriated from said river for said use the additional amount of 50 cubic feet of water per second, said appropriation took effect April 1, 1900; said ditch is thereby entitled to ditch priority No. 51 in Weld, Morgan and Washington Counties."

It is conceded that by the 1895 decree the ditch was found to have capacity of 450 feet per second of time, though by reason of non-application to a beneficial use, its decreed priority was necessarily limited to 125 feet per second, and the date of its priority was fixed by the decree as of October 1, 1888. Then if there is evidence in this case upon which to base the further findings of the court as to reasonable diligence and application to beneficial use, such findings may not be disturbed, and under the settled law and by the doctrine of relation in this jurisdiction, its priority for the 450 feet so applied must be fixed as of date of October 1, 1888.

The testimony shows that the enterprise passed through many vicissitudes, including foreclosure, and changes of ownership, until about the 1st day of April, 1900, when work of repair commenced and continued, with the application of water, when available, until time of trial. The expense upon the ditch since such renewal of diligence is estimated at $200,000. Water running through the ditch has been used to supply the Bijou reservoir owned by the same company. We think the testimony justifies the finding as to the number of acres which have been and are now being irrigated from the ditch, and the capacity of 550 cubic feet is not disputed.

It may be well questioned whether reasonable diligence is shown from the date of the 1895 decree up to April 1st, 1900, and if the priority of Trowel Company had attached prior to the latter date, when the defendant in error resumed and continued active diligence, we are inclined to believe that the doctrine of relation could not be held to apply as against the decreed priority of the Trowel Company, though we do not decide the point. But the Trowel Company claimed and was decreed a priority as of date of December 27th, 1900, more than six months after the resumption of work by the Bijou owners.

Under the doctrine of *Beaver Brook Co. v. St. Vrain Co.*, 6 Colo. App. 130, 40 Pac. 1066, the Bijou Company had cured its laches and by its continued acts of diligence to completion and application was entitled to perfect its right. It was said in that case:

"That the interval from 1882 until 1893 was presumptively too long must be conceded, were the reasons and circumstances unexplained—and the explanation in this case can hardly be deemed sufficient—but how can that enure to the benefit of appellants? If, by neglect to apply the water within a proper time, the right to apply was forfeited, the water reverted, and any one could proceed to appropriate and apply it; but such right could only attach while the right of the former claimant was in abeyance by reason

of his negligence, and the second party must have availed himself of the right before the re-entry and prosecution of the enterprise by the f st party. Unless, during the interim, when by failure to prosecute the enterprise, the water right may be regarded as having reverted, some party intervenes and makes a valid and legal appropriation of the water, the first party may resume, and if such resumption occurs before intervening rights attach, the right to appropriate is lost." See also *Rogers v. Pitt,* (C. C.) 129 Fed. 932, and *Tucker v. Jones,* 8 Mont. 225, 19 Pac. 571.

As to the fifty second feet decreed by the court to the Bijou Company by virtue of an enlargement as of priority date of April 1st, 1900, we can not disturb the finding and decree. The appropriation antedated that of the Trowel Company by more than eight months, and the evidence is sufficient to sustain the claim of reasonable diligence and application to beneficial use.

It is urged that as the Trowel decree was entered on July 14, 1904, and this proceeding instituted on January 5th, 1909, the two and four years statutes of limitations constitute a bar to this proceeding in so far as it relates to the priority of appropriation in excess of the award of 1895. The decree of 1895 awarded a priority of 125 cubic feet only. This award is not questioned and it is the only final award. These statutes of limitation run only against a final and an absolute decree. Sec. 3837 M. A. S. 12. The rights of the Bijou Company claimed or determined in this proceeding were not finally decreed in the adjudication of 1895.

It is also contended that the Bijou Company is estopped from asserting its claim here determined, for the reason that, though notified and appearing in the proceeding resulting in the Trowel decree of 1904, it failed to assert its claim.

It is sufficient answer to say that the right of that company is controlled by the rule of reasonable diligence, and it is not bound to assert its claim in any particular special

proceeding. If the Bijou Company was duly proceeding under an inchoate right to the completion of its enterprise, it is not within the province of one who institutes a special proceeding to determine when its claim shall be adjudicated.

It is contended on the other hand by the defendant in error that the decree of 1904, awarding the Trowel ditch a priority as of date of December 27, 1900, for ninety cubic feet of water per second, is invalid. The contention is that the decree was rendered in a special proceeding, that the petition was confined to the one appropriation, and was not made in a statutory proceeding for a general adjudication. In view of our holding here the question becomes immaterial as it relates to the defendant in error. But the parties to this proceeding were likewise parties to that, and this court treated the proceeding as a proper one in which to obtain the decree rendered. *Broad Run Co. v. Deuel,* supra. The priority of the Trowel Company in that respect stands adjudicated, as does its claim for an appropriation of 15 feet, as an overflow right, and the trial court seems to have so treated it.

We must therefore hold that the appropriation of the Trowel Company is valid, but is subject and junior to the priority of the Bijou Company as decreed by the trial court.

We now come to the claim of the plaintiff in error for an appropriation of seepage waters under the Shoemaker ditch, denied by the court.

The claim of the plaintiff in error, for the Shoemaker ditch and branches, is that it is a drainage ditch, and its purpose to drain waters from lands along and near the ditch and branches, theretofore rendered unfit for cultivation by reason of seepage and swampy conditions; that said waters had no outlet to, nor was it any source of supply for the South Platte River, or any of its tributaries; that such ditch was for the purpose of reclaiming said lands, and to use the water arising therefrom for irrigation purposes; that the claimant derived title to such waters by conveyance from the Jackson Lake Reservoir, situate above said lands, and

by conveyance of the right to collect and use said waters from the various owners of the lands through which the ditch and its branches were constructed, and by succeeding to all right to the Curry ditch, theretofore constructed; that the waters so collected are delivered to the South Platte River, which is used as a means of carrying such water to the headgate of the Trowel ditch, owned by the claimant, and there diverted from the river and used for irrigation upon the lands of the Trowel ditch; that there has been so developed 50 cubic feet of water; that work was commenced on the ditch, including the enlargement of the Curry ditch August 8, 1906, and that since that time said water has been so applied for irrigation.

The contention as against this claim is that the waters so drained are not the subject of appropriation, but are from waters theretofore appropriated and naturally tributary to the river before the appropriation initiated, and that such re-diversion must be according to relative priority of appropriation within the water district, which contention was sustained by the court and is now before us for review.

The referee's findings, approved by the court, show that the Shoemaker ditch and its branches lie between the Jackson reservoir and the Weldon Valley ditch, constructed several years before, and which is likewise a drainage ditch. That there is a rapid slope from the reservoir and from the Weldon Valley ditch to the South Platte River, and that underneath the upper soil of the land between the reservoir and the river there is a gravel substratum in which water flows definitely toward the river. The ditch is dug down to the gravel underground water course. There is a fall of 59 feet from the surface of the ground at the base of the reservoir to the river, which is directly south a distance of two and one-half miles. The appropriation claimed under the Curry ditch was abandoned in 1894, and thereafter such ditch became a natural water course, collecting underground waters and delivering the same to the river; that the waters intercepted by claimants' north

branch from seepage of the Weldon Valley ditch would have reached the river, through the gravel and by reason of the slope, if not intercepted by the ditch. That as to the waters escaping from Jackson reservoir and collected by the ditch, the evidence does not distinguish what part of such waters were collected by the north branch, or what part is from the Weldon Valley seepage, and that it is impossible to distinguish such waters. That there was a well defined water course through the substratum to the river from the Weldon Valley ditch at the time the Jackson reservoir commenced to store water.

The south branch of the Shoemaker ditch is the old Curry ditch, dug deeper into the gravel. Underground seepage, waste and return waters collected by this ditch and escaping from the Weldon Valley ditch had been tributary to the river before the Curry ditch was built, and thereafter by abandonment, the latter became a natural water course, and waters from the Weldon Valley ditch became tributary thereby, as well as underground, to the river. It is then concluded that while claimant may have hastened the flow to the river by the construction of the ditch, yet it has contributed no new supply.

The testimony discloses other facts not suggested in the findings. It appears that prior to the construction and filling of the Jackson reservoir, the lands afterward drained by the Shoemaker ditch were cultivated and dry lands, and that within a reasonable time thereafter these lands became seeped and swampy to such an extent as to make them wholly unfit for cultivation. That prior to the construction of the ditch the owners of the lands threatened suit against the reservoir company for damage occasioned by reason of the seepage water from the reservoir, and that at least one such action had been instituted.

The construction of the ditch was apparently a compromise between the reservoir company and the land owners, and to which enterprise the reservoir company largely contributed in order to avoid its liability for damage.

It further appears that the reservoir company and the land owners conveyed to Shoemaker, who constructed the ditch, their right to the use of the waters to be so drained, for use in irrigation. Shoemaker was the predecessor in interest of the Trowel Company. It also appears that the waters from these lands so drained had not reached the river, either by seepage or otherwise. It may be said further that it is clear that no perceptible quantity of water which seeped such lands came from any other source than the Jackson reservoir. And that substantially all water entering the Shoemaker ditch came from such undrained lands, with the exception of such as was drained by means of the old and then abandoned Curry ditch, which was afterward cleaned out and enlarged so as to carry the waters arising from the new part of the Shoemaker ditch. This water was in very small quantity; the exact amount is not ascertainable from the testimony. It also appears that lying on the lower side of the swamped lands so drained was a ridge of soil impervious to water and which apparently held back, or acted as a dam to hold the water upon the seeped lands, prior to the construction of the ditch. But it likewise appears that the ditch reached a depth below such formation and that the bottom of it was in the gravel and sand formation, which the court finds to extend from the Jackson reservoir to the river.

It also appears that Shoemaker expended something like $20,000 in the construction of the ditch, upon the theory that he should have for his own use the water so gathered, and that he was induced to so believe by the statements, acts and direction of the State Engineer, who caused the waters to so flow into the stream and to be diverted and applied as claimed, from the completion of the ditch, in 1907, up to the year 1910, a time subsequent to the initiation of this proceeding, and that all this was done without an effort to notify Shoemaker of any claim as now asserted against his rights. It is not contended, however, that these facts act as an estoppel, but that in equity they should be considered.

In considering the fact that the seepage waters from the drained area, arising because of escape by seepage from the Jackson reservoir, had not reached the river, counsel lay stress upon language used in the case of *Comstock v. Ramsey,* 55 Colo. 244, 133 Pac. 1107, as follows:

"We do not hold that there can be no independent appropriation of seepage, return and spring waters; but on the contrary, where such appropriation does not interfere with a prior right, that it may be done upon facts and conditions which warrant it. What and all we do intend to here determine, on this particular point, is that where it appears that such waters are in fact tributary to the stream, and form a substantial and material source of its supply, upon which appropriators therefrom have long depended for water to satisfy their priorities, that then, as between such bona fide appropriators and users of such waters and a new claimant, the former has the first and better right."

It is then contended that the water here had not reached the river, and had not long been depended on, or at all, to satisfy ditch priorities, and is therefore not within the rule in that case. But the language referred to has a broader meaning and can not be confined to the physical fact that the particular water involved had not reached the stream, but rather to escaped waters generally which would naturally, and in course of time, reach the stream. Indeed, the finding of the trial court in that case, supporting the contention here, was expressly repudiated, for there, as here, the seepage water involved had not in fact reached the stream. The important fact is whether or not the seepage water is naturally tributary, or will naturally return to the stream, and the court said:

"We take judicial notice of the fact that practically every decree on the South Platte River, except possibly only the very early ones, is dependent for its supply, and for years and years has been, upon return, waste and seepage waters. This is the very thing which makes an enlarged use of the waters of our streams for irrigation possible."

Counsel further contend that there is a distinction between the relation of ditch owners in this respect, and reservoir owners where the water is impounded, in that, except in case of negligence, the ditch owner has no concern as to escaped waters, while the reservoir owners is responsible for damage occasioned by escaped water, regardless of the question of negligence. It is argued that the reservoir owner must be allowed to exercise control over the water impounded, both while so impounded and during the course of its release, so as to protect himself from damage, and that logically under such conditions it would remain the property of the reservoir owner until its abandonment; and if sold while in the dominion of the reservoir owner, the purchaser should acquire good title thereto.

Doubtless a reservoir owner, if he may have acquired the right of way, may construct a ditch and drain the lands which the reservoir may have damaged, as an alternative to being mulcted in damage, but this can not confer the right to sell the use of such drainage water if it may naturally return to the stream.

Even if this contention were to be accepted, it can not be applied to the facts in this case. It is patent from the testimony and from counsel's argument that the purpose of the reservoir company was to avoid its liability in damage, and not to apply the seepage water to a beneficial use, and it did not do the latter, but on the contrary contributed funds toward the construction of the ditch, without other reward than the accomplishment of its prime purpose.

The law makes no distinction as relates to the return of water to the stream between that from a reservoir supplied by a natural stream, or from a ditch supplied directly from the stream, regardless of the fact that the reservoir may be chiefly supplied in time of high water, or in the non-irrigation season.

In the *Ramsey* case, the seepage water involved escaped water, both from a reservoir and ditch, and it was there said, speaking of the identical stream here involved:

"Every appropriation of water on this stream, claimed and decreed for irrigation purposes, has been so claimed and decreed upon the theory that all waste and seepage water arising from the irrigation of land, or from the construction and maintenance of reservoirs using water from the river, and naturally returning to it, is available to supply such appropriations and decrees."

We think the fact as found by the court that there is a continuous stratum of gravel formation reaching from the Jackson reservoir to the river, through which the seepage waters involved may pass, by percolation, and thereby naturally reach the river from which such waters were originally diverted, is controlling in this case, and that the reasoning in the *Ramsey* case must be applied.

On the first day of June, 1910, the Trowel Company institutes a suit in the District Court of the City and County of Denver, praying a mandatory injunction to compel the water officers to divert the water from the Shoemaker ditch into the Trowel ditch, which it was alleged it refused at that time to do.

The complaint in that case alleged the same state of facts as in its claim in this case. The water officers demurred to the complaint upon the grounds that it did not show an adjudicated right in plaintiff to the use of such waters; that the complaint on its face shows that this general proceeding was at the time instituted and pending, and that the court was without jurisdiction to determine the water rights in water District No. 1.

The demurrer was overruled and the defendants electing to stand upon their demurrer, the injunction was granted in accord with the prayer of the complaint. That case is now before us for review, entitled *Samples et al. v. The Trowel Land and Irrigation Co.*, 176 Pac. 297, and by agreement is to be determined in connection with this case.

It is alleged as error that the trial court refused to give full force and credit to the judgment rendered in that case. It is clear that the court was without jurisdiction to hear

or determine the cause and the demurrer should have been sustained and the cause dismissed. The complaint failed to allege a decreed right to an appropriation in the ditch.

It has been uniformly held by this court that the decree in such case is the sole and only guide and authority for water officials, from which they must determine in the discharge of their duties the relative rights of parties, the volume to which different ditches are entitled, the point of diversion, and all other data necessary to a distribution of the waters in accordance with the provisions of the decrees. We take judicial notice of the fact that under and in accordance with the provisions of the law, the District Court of Weld County has exclusive jurisdiction in matters of adjudication of water rights in District No. 1.

The judgment of the District Court of the City and County of Denver was without force or effect, and the court did not err in refusing to consider it.

The judgment is affirmed:

*En banc.*

White, J., specially concurring.

Garrigues, J., concurring in part and dissenting in part.

Hill, C. J., not participating.

Decided May 6, A. D. 1918. Rehearing denied December 2, A. D. 1918.