# APRIL TERM, 1922

## No. 9819.

THE FORT MORGAN RESERVOIR & IRRIGATION CO., ET AL. *v.* MCCUNE, STATE ENGINEER, ET AL.

Decided March 6, 1922. Rehearing denied May 1, 1922.

Action involving the claim of a reservoir company to the right to recapture and apply water seeping from its reservoir. Decree upholding the claim.

### *Reversed.*

1. WATER RIGHTS—*Water Officials—Duties—Power of Courts.* Water officials must distribute water according to decreed priorities, and a court has no power to direct them to do that which the duties of their office does not require of them.

2. *Seepage Water—Appropriation.* Water escaping from a reservoir or a ditch, underground, and becoming percolating water which will naturally reach a public stream, must be regarded as a part of the stream; it belongs to the appropriators in the order of their priorities when needed, and cannot be made the subject of a direct appropriation.

*Error to the District Court of Weld County, Hon. Robert G. Strong, Judge.*

Mr. JAMES W. MCCREERY, Mr. DONALD C. MCCREERY, Mr. STOTON R. STEPHENSON, for plaintiffs in error.

Mr. HARRY N. HAYNES, Mr. S. E. NAUGLE, Mr. HAROLD D. ROBERTS, Mr. CHARLES W. WATERMAN, Mr. CALDWELL MARTIN, for defendants in error.

*En banc.*

MR. JUSTICE TELLER delivered the opinion of the court.

THE plaintiffs in error were plaintiffs below in a suit to enjoin A. A. Weiland, as state engineer, and other water officials named, from enforcing an order of the state engineer allowing The Prewitt Reservoir and Land Company to use certain seepage and underflow waters alleged to be tributary to the South Platte River, which said use was alleged to be contrary to the decrees of appropriation, and injurious to the plaintiffs' priorities. The present state engineer was made a party on succeeding to the office. The court found in favor of the defendants, dismissed the complaint, and directed the water officials to recognize the water discharged from the drainage ditch of the reservoir company as belonging to that company, and to permit a re-diversion thereof by the other irrigation companies "to the same effect as is designated in the order made by the former state engineer * * * whether it was entered with or without jurisdiction" said order being adopted as the order of the court in the premises. The decree thus entered is now here for review on error.

This case presents for determination two questions: First, was there error in the judgment in that it directed the water officials to distribute undecreed water to the non-official defendants, or in other words, because it directed said officials to take affirmative action in the premises? Second, was there error in determining that the water from the drainage ditch in question belonged to the reservoir company?

Under the statutes and decisions of this court, the water officials must distribute water according to the tabulated decrees; they have to do only with decreed priorities; with unappropriated waters they have no concern.

So long as all the water is required to supply decreed priorities, said officials should permit no water to be diverted for new appropriations. Whenever there is a surplus of water, either from floods, or because of small demands therefor by appropriators, the officers have no right to interfere in the diversion of such surplus. All new appropriations must be made from surplus water, whether

for storage or direct irrigation. When, therefore, the court directed the state engineer to distribute undecreed waters from said drainage ditch, he was directing the officer to do that for which there was no authority. If, upon the equities of the case, as shown in the evidence, the court was of opinion that the defendants were entitled to the water in question, he might properly have enjoined the officials from exceeding their authority by distributing this water to others. If the facts justified it, the court could have enjoined the officials from interfering with the defendants turning into their ditches the water which they claimed; but the court had no power to direct the water officials to do that which the duties of their office did not require of them.

The effect of this decree in the respect named is to adjudicate the question of appropriation in a nonstatutory proceeding in which but a small number of the appropriators interested were parties, and that, too, while a statutory proceeding was pending in which a claim for this water had been filed.

The second question is of greater importance, and must be determined by reference to established principles of irrigation law. In the statement and claim filed with the state engineer in 1914 the reservoir company claimed sixty cubic feet per second of time "for irrigation purposes."

The theory of defendants in error now appears to be that they are entitled to the water as a part of their original diversion and appropriation.

In *Comstock v. Ramsay*, 55 Colo. 244, 133 Pac. 1107, this court had under consideration the right of Ramsay to appropriate underground water alleged to have escaped from a reservoir and ditches, where the seepage has been long continued, and was naturally tributary to the Platte River. We held that when it appears that such waters will ultimately return to the river, they are a part and parcel thereof, whether the limit of time in which they reach the river be long or short; that as soon as they start on their way to the river, and it is apparent that they will reach it, they

constitute a part of the stream, and are not subject to independent appropriation, as new or added water, or because they have been used to serve one priority.

The same doctrine was again announced in *Durkee Ditch Co. v. Means,* 63 Colo. 6, 164 Pac. 503, where the court said:

"The fact that these waters have been captured before they again reach Dry Creek in no wise strengthens the position of petitioners, for the waters are to be considered a part of the stream from the moment they are released by a user, under an appropriation from it, and they must be permitted to return to the stream for the benefit of other appropriators therefrom, in the order of their priorities."

In *Trowel Company v. Bijou District,* 65 Colo. 202, 176 Pac. 292, there was presented the case of a reservoir company assigning its supposed right to seepage from its reservoir, the construction of a ditch by said assignee for the collection of such water, and a claim by him of a right to the use of it. In denying the right to the water in that case we said:

"Doubtless a reservoir owner, if he may have acquired the right of way, may construct a ditch and drain the lands which the reservoir may have damaged, as an alternative to being mulcted in damage, but this can not confer the right to sell the use of such drainage water if it may naturally return to the stream."

And again:

"The law makes no distinction as relates to the return of water to the stream between that from a reservoir supplied by a natural stream, or from a ditch supplied directly from the stream, regardless of the fact that the reservoir may be chiefly supplied in time of high water, or in the non-irrigation season."

In that case was determined also, by agreement of the parties, the case of *Samples, et al. v. The Trowel Land & Irrigation Company.* In that action the irrigation company sought a mandatory injunction to compel the water officers to divert the water from the Shoemaker Ditch into

the Trowel Ditch. The water officers demurred to the complaint, and upon the overruling of the demurrer elected to stand thereon, and the mandatory injunction was granted. The complaint failed to allege a decreed right to an appropriation in the ditch. We there said:

"It has been uniformly held by this court that the decree in such a case is the sole and only guide and authority for water officials, from which they must determine in the discharge of their duties the relative rights of parties, the volume to which different ditches are entitled, the point of diversion, and all other data necessary to a distribution of the waters in accordance with the provisions of the decrees."

It was therefore held that the mandatory injunction was improperly issued. That is important as bearing on the first point herein discussed.

The next case in the order of time in which the matter of seepage had consideration is the *Rio Grande Reservoir & Ditch Co. v. The Wagon Wheel Gap Improvement Co.*, 68 Colo. 437, 191 Pac. 129. Defendant in error in that case sought to make an original appropriation of water seeping from a reservoir constructed by the plaintiff in error. The opinion states of this claim that "the right is based upon the theory that the waters having been impounded in the reservoir during the winter months when direct irrigation is impossible, have not been and could not have been appropriated for direct irrigation." This court, however, applied the rule laid down in the Ramsay case to the effect that seepage water belonged to the river, and that no direct appropriation could be made of it except subject to vested rights.

It is said, however, that the case of *McKelvey v. North Sterling Irrigating District*, 66 Colo. 11, 179 Pac. 872, sustains this judgment. The facts in the two cases are quite different; in the McKelvey case there was no consideration of seepage water. From the findings of the trial court it appeared that water from the North Sterling Ditch broke through the bank where the ditch crossed a draw, hitherto

dry, and water to the amount of four cubic feet per second of time escaped in the above named manner, and ran down the draw. The court specifically found "that said waters so escaping are not merged or mingled with any other waters." It involved running, and not percolating water. This case throws no light upon the question here under consideration.

The instant case is distinguished from those cited above only in the fact that seepage water from a reservoir is claimed as a part of the original storage appropriation, and not for a new and direct appropriation.

Treating this case, then, as presenting a matter not hitherto directly in issue in any case, it remains to ascertain whether or not the principles laid down in the preceding cases are applicable to the facts of this case. Beginning with the Ramsay case the principle upon which the decisions are based appears to be that water escaping from a reservoir, or ditch, *underground,* and becoming percolating water which will naturally reach a public stream, must be regarded as a part of the stream. This appears to be in all the cases the *ratio decidendi.* That being so, no reason appears why the principle should not be applied in this case.

These cases show that it has been held by this court that the question of diligence in attempting a recapture, or the time during which the seepage has run, or the question whether or not the water was appropriated when not needed for direct irrigation, is not material. When it has become, potentially, under the rule above stated, a part of the river, it belongs to the appropriators in the order of their priorities whenever needed. It cannot, therefore, be made the subject of a direct appropriation nor can it, by a fiction, be regarded as still in storage, or a part of stored waters. The danger from a different rule appears from the following:

This is not seepage through the banks only. According to Engineer Bishop, testifying for the defendants, the water escaped through the bottom of the reservoir, drove

the old ground water forward and upward, and raised the water table over the entire area north, northeast and northwest of the reservoir. This distinguishes the case from the McKelvey case. The claim is for sixty cubic feet of water, which it is stated is the total capacity of the ditch.

From the record it appears that the loss by seepage varies with the changing depth of water in the reservoir. It also appears that the loss is decreasing from year to year. A decree for all that escapes when the reservoir is full would give a right to more water than escapes at lower stages, and the amount which may be fairly allowed in one year might be far too large in subsequent years. If, for example, the ditch be given the sixty cubic feet claimed, because that was found to be the amount of seepage from a full reservoir when the appropriation was initiated by beginning the construction of the ditch, and that quantity be distributed to it at other stages of water in the reservoir, or in later years, when the seepage is not so great, the claimants will be getting seepage to which they have no right, even on their own theory.

This illustrates the difficulty which will be encountered in the distribution of seepage water under the rule proposed by defendants in error. It would clearly be impracticable to allow a ditch a right changing from time to time as to quantity, as the water in the reservoir varied in quantity.

The justice of allowing reservoir companies to control the water which they have diverted is not to be questioned; but it should be borne in mind that they do not own the water, but have only a right to its use; which use must be consistent with the rights of other appropriators. When water has escaped from a reservoir and become a part of the underground waters, its identification as reservoir water is impracticable, if not impossible. The rule to be applied in such a case must take account of the rights of others, and be of general and practicable application. Such is the rule above stated and applied.

It follows that the district court erred upon both of the

propositions discussed herein, and the judgment is accordingly reversed, and remanded for further proceedings in harmony with the views herein expressed.

MR. JUSTICE DENISON and MR. JUSTICE BURKE dissent.

MR. CHIEF JUSTICE SCOTT not participating.

MR. JUSTICE BURKE dissenting.

I regret my inability to concur with the majority. It seems to me that the conclusion reached by the court leaves the law on the main question at issue in such an unsettled condition in this jurisdiction as to make imperative a statement of the reasons for this dissent.

The principal question here presented is the right to the use for irrigation of waters escaping from the Prewitt Reservoir, an irrigation storage project. The issues are thus clearly stated in the opening brief.

"Two principal issues were presented for the final determination of the court, to-wit (a) The validity of the order of the state engineer and the jurisdiction of that officer in the premises; (b) The alleged right of the Prewitt Reservoir & Land Company and other non-official defendants to recover the waters escaping from the reservoir * * * so that the same might be separated from the waters of the river and devoted to the exclusive use of said defendants."

For convenience I consider them in that order.

In determining the first it must necessarily be assumed that defendants are entitled to the waters in question. If so it seems clear that they must look for protection to the water officials because we have held that such claimants have no place in a general adjudication proceeding. *Rio Grande Res. & Ditch Co. v. Wagon Wheel Gap Imp. Co.,* 68 Colo. 437, 191 Pac. 129.

These water officials are directed to distribute water "in accordance with the right of priority of appropriation, as established by judicial decree" but they also "have the authority to make such other regulations to secure the equal

and fair distribution of water, in accordance with the rights of priority of appropriation," etc. Sec. 3344 R. S. 1908.

Counsel for plaintiffs admit an exception to the rule that water officials may distribute water only "according to tabulated statement of priorities," that exception being "where water is turned into a stream from a reservoir to be taken out again to be applied to the lands for which it was intended." Sec. 3225 R. S. 1908.

If these defendants are entitled to the water in question it is because, under the law, it is to be treated exactly as water voluntarily turned out by them into the stream to be so carried, taken out and applied. It therefore comes within the admitted exception.

Defendants, however, did not rest their case upon the validity of the order of the state engineer and were not required to do so. If for other reasons than the order they are entitled to have the water in question distributed as directed the judgment herein should so declare. Equity having taken jurisdiction for one purpose will hear and determine all matters necessarily involved.

The following facts are either admitted by the parties or found by the court upon sufficient evidence.

Before any water was run into the reservoir defendants' engineer, under their directions, investigated the feasibility of saving anticipated percolation in order to use the recaptured water and avert damage therefrom. The reservoir was completed and water turned in November 21, 1912. Within three weeks thereafter excessive seepage appeared. Final survey of the drain ditch was begun December 16, 1912. Defendants filed with the state engineer their sworn statement and map claiming the escaping waters. February 13, 1913, construction of the drain ditch was begun with promptness and completed with diligence. The waters diverted into the reservoir were otherwise unappropriated. All waters in the drain ditch came from the reservoir. These recaptured waters are but seventy per cent of the total seepage, the remaining thirty per cent

returns to the river and is available for direct irrigation by prior appropriations. The whole would be unavailable but for the reservoir diversion. Without defendants' recapture of a large portion of this seepage their reservoir project would be economically untenable. The drain ditch was constructed by defendants with the intent and for the purpose of supplying the recaptured waters to their consumers for immediate irrigation when needed and reimpounding the same when not needed.

The question now is, "May a reservoir appropriator who takes his water for storage during the non-irrigating season, who finds it escaping from his ditch or reservoir before it has served the purpose of its diversion, who begins promptly and prosecutes to completion with diligence a plan for its recapture, whose intent to recapture is made continually manifest, who retakes it for the purpose of its original diversion before it has become the basis of another appropriation, be permitted to so apply it?" Plaintiffs assert the negative. They contend that the moment seepage begins and it is manifest that the escaping water, if not interfered with, will eventually return to the stream, it belongs thereto and can not be retaken by the reservoir appropriator. They assert that this position is supported by adjudicated cases in this court and the doctrine thus firmly imbedded in our irrigation law.

Those authorities, they say, are the following: *Water S. & S. Co. v. L. & W. Res. Co.*, 25 Colo. 87, 94, 53 Pac. 386; *Buckers Irr. Mill & Imp. Co. v. Farmers' D. Co.*, 31 Colo. 62, 70, 72 Pac. 49; *Comstock v. Ramsay*, 55 Colo. 244, 133 Pac. 1107; *In re German Ditch & Res. Co.*, 56 Colo. 252, 139 Pac. 2; *Durkee Ditch Co. v. Means*, 63 Colo. 6, 164 Pac. 503; *Trowel Land & Irr. Co. v. Bijou Irr. Ditch Co.*, 65 Colo. 202, 176 Pac. 292; *Rio Grande Res. & Ditch Co. v. Wagon Wheel Gap Imp. Co.*, 68 Colo. 437, 191 Pac. 129.

An examination of these cases, and a comparison of their facts with those in the instant case, shows no one of them in point.

In *Water S. & S. Co. v. L. & W. Res. Co., supra*, the lan-

guage relied upon by plaintiffs is:

"Waste waters which are again returned either to the main stream, or its tributaries, become a part of the waters of the stream the same as though never diverted, and inure to the benefit of appropriators in the order of their appropriations."

This statement is general and unless "waste waters" referred to by the court therein are the kind of waters here involved the language is inapplicable.   The fact is that the water in question in that case had served the purpose for which it had been diverted, or been permitted to escape with no manifestation of an intent to retake it and no question of the right of the original appropriator thereto was, or could have been, involved.

In *Buckers Irr. Mill & Imp. Co. v. Farmers' D. Co., supra,* there was no question of an attempted recapture by reservoir appropriators.   The Buckers Company was merely claiming water which it insisted it had developed.   This was a "development" from sloughs, surface and seepage waters.   It made no pretense that this water had escaped from its diversion.   The court expressly found that "no question of percolating waters is involved."   None of the material facts of the Bucker's case are similar to those before us.

In *Comstock v. Ramsay, supra,* the contest was over surface water which had developed in excessive quantities in 1890 and 1891.   The first attempt at a diversion of any of it did not occur until 1894.   Ramsay's claim to the seepage waters rested upon a conveyance by Gordon and Varvel who did not construct their ditch until 1907, and the main question was whether such seepage waters were tributary to the river.   It appeared that upon them "old decreed priorities have long depended for their supply," "that such water is not only now, but for years has been, a material and substantial source of supply to the South Platte river." True it is said that:

"When it is shown or admitted that these waters ultimately return to the river and thereby augment and re-

plenish its flow, they are part and parcel thereof, whether the limit within which this occurs be long or short. The moment they are released by a user under an appropriation from the river, which has been duly decreed, and start back in their course to the stream, they become and are as much a part thereof as when they actually reach the stream. Whenever these waters start to flow back to the river and it is apparent they will reach it, they constitute a part of the stream."

Upon this language, more than any other in the adjudicated cases, rests the contention now made by plaintiffs, but the applicability depends upon a similarity of facts wholly absent. The waters had become actual seepage. No claim was made to them by the original appropriator. No attempt had been made by it to recapture them. No diligence had been shown by any one. The water had served the purpose of its original diversion and had become the basis of other appropriations. Nor must we overlook the language following that last quoted, and which modifies and explains the statement there made, i. e., such waters "are not subject to independent appropriation as new or added water, or because they have been used to serve one priority." The water there discussed by the court is water which has left "the control of the original appropriator, having been used either for direct irrigation or reservoir purposes, without intention of recapture or further use, by him." The sole question disposed of in the Comstock case is thus summed up by the court:

"What and all we do intend to here determine, on this particular point, is that where it appears that such waters are in fact tributary to the stream, and form a substantial and material source of its supply, upon which appropriators therefrom have long depended for water to satisfy their priorities, that then, as between such *bona fide* appropriators and users of such waters and a new claimant, the former has the first and better right."

It is thus observed that the question now before us is left wholly untouched by the Comstock case save for an

inference from general language applied there by the court to a wholly different state of facts, and afterwards qualified.

In the German Ditch & Reservoir case, *supra,* the action was one for the adjudication of priorities from Dry Creek. The question arose upon an application for rehearing, review and reargument to determine whether Dry Creek was a natural stream. Interveners contended that it was and that its waters had long since been appropriated by decrees on the South Platte river and that such waters had been used thereunder for many years. It appeared that waste and seepage waters began to flow into Dry Creek between 1880 and 1885, which condition continued and increased through many years to the date of the hearing. Under such circumstances the trial court found that Dry Creek was not a tributary of the South Platte river and that finding we reversed. There is nothing in the case which throws any light upon the question now before us.

The Durkee Ditch Company case, *supra,* was likewise a proceeding for the adjudication of priorities. The petitioner took its waters from Madsen Gulch which emptied into Dry Creek. These Madsen Gulch waters were seepage and return waters and the question was whether Madsen Gulch was tributary to Dry Creek and appropriations on the latter thereby interfered with. The holding was that the waters of Madsen Gulch were tributary to Dry Creek and not subject to independent appropriation. These were not escaped waters. No original appropriator was claiming them and they had all served the purpose of their original diversion.

The Trowel Land & Irr. Co. case, *supra,* was a general adjudication proceeding and we are concerned only with that portion of it relating to the claim of the Trowel Ditch under the alleged rights of the Shoemaker seepage ditch. The Shoemaker ditch had a conveyance of the seepage water in question from the Jackson Lake Reservoir, and had succeeded to the rights of the Currey Ditch. The appropriation claimed by the Currey Ditch had been aban-

doned and it thereafter became a natural water course, collecting and carrying to the river under ground waters. It also carried waters escaping from Jackson Reservoir. These waters it was impossible to distinguish. Until the construction of the Jackson Reservoir the lands, afterwards drained by the Shoemaker Ditch, were cultivated and dry. Thereupon they became seeped and swampy. One damage suit was initiated and others threatened against the Jackson Lake Company by reason of this seepage. The construction of the drainage ditch was a compromise of these claims and the reservoir company contributed to it to escape liability. Shoemaker was an outsider and built this ditch on the theory that he would be entitled to the water collected. It is said in this opinion that:

"The law makes no distinction as relates to the return of water to the stream between that from a reservoir supplied by a natural stream, or from a ditch supplied directly from the stream, regardless of the fact that the reservoir may be chiefly supplied in time of high water, or in the non-irrigation season."

But again the language must be applied to the facts there under consideration and those only. The reservoir company there was not claiming the water. It was merely attempting to escape a liability and to that end had transferred its supposed rights. Lack of diligence, rather than diligence, was disclosed. The original appropriator had manifested no intent to recapture and use the water. The case is not in point.

In the Rio Grande Res. & Ditch Co. case, *supra*, appear many facts similar to the case at bar. If the main opinion there only were looked to some excuse might be found for its citation. But again the facts are in many particulars different. On the point here involved three of the Justices dissented and two of them wrote dissenting opinions. On application for rehearing this opinion was given a construction Per Curiam, which must be taken as absolutely

limiting and controlling the authority. That construction reads:

"The sole question determined as to seepage water is that no decree, on the facts of this case, for an apropriation thereof by the reservoir company, for direct irrigation, antedating all appropriations from the river for like use, can lawfully be awarded. No other question, upon the subject of seepage, has been presented, considered or adjudged herein."

It must be observed that the Justice who wrote the opinion, and those concurring therein, acquiesced in this construction. It is therefore certain that the Rio Grande case is authority for nothing in the instant case save that the Reservoir Company would not be entitled to ask an original, direct appropriation, in a general adjudication proceeding, for the water here involved.

From the foregoing it seems clearly apparent that the cases cited by plaintiffs, nor any one of them, upholds the contention now made, or depended upon facts similar to those now before us, and that, if no other authority were to be found, the question with which we are now dealing would be a new one in this jurisdiction.

We have, however, in this court, a case determined upon facts so similar that no controlling distinction can be drawn, and one which settles the question adversely to the contentions now made by plaintiffs. *McKelvey v. North Sterling Irr. Dist.,* 66 Colo. 11, 179 Pac. 872. It was decided En Banc, without dissent, the only Justice not participating being the one who had tried the case below and reached the same conclusion. The plaintiff was represented by counsel who now appear for the plaintiffs here. The cause was orally argued. The Justice who wrote the opinion also wrote the opinion in the Trowel case, and the Justice who wrote the opinion in the Comstock case, the Durkee case and the Rio Grande case, concurred therein. The action was for injunction. It was brought by the owners of the reservoir from which seepage escaped. They had been diligent in their effort to recapture the escaping water.

The water had never been used for the purpose of its original diversion. The Company had filed a map and statement which were construed as evidence of the appropriator's intent. All as in the instant case. The only apparently material difference being that McKelvey, claimant of the water through the construction of a drain ditch, was not a prior appropriator on the stream. This becomes immaterial in view of the fact that the reservoir owner brought the action and could succeed only on the basis of the validity of its own right. Had the law been as now contended by plaintiffs herein no relief could have been given the North Sterling Irrigation District in the McKelvey case.

An examination of the briefs of plaintiff in error in that case will show that the same question was involved, the same contention made, and the same authorities relied upon as in the instant case. There, as here, the storage rights of the Reservoir Company had not been adjudicated. It was contended there, as here, that the findings and decree of the lower court were under a misapprehension of law, and that the escaping water was tributary to the river and lost to the reservoir appropriator. The unmistakable conclusion of the court was that the owner of the reservoir, who took the water during the non-irrigating season (which water escaped before serving the purpose of its diversion) whose intent to recapture was made continually manifest, whose work of recapture was begun with promptness and prosecuted to completion with diligence, and who retook the water before it became the basis of another appropriation, was entitled thereto. To sustain the judgment in the instant case therefore requires no departure and involves no conflict; to reverse it, the rule laid down in *McKelvey v. North Sterling Irr. District, supra,* must be ignored. From this conclusion there seems to me no escape.

An affirmance of this judgment would enrich all prior appropriators on the river to the extent of thirty per cent of the water escaping from the Prewitt Reservoir, which

has not, and can not be recaptured, but has gone to supply their decrees. A reversal gives them now the other seventy per cent, upon which they have never depended, which they have spent no effort and no dollar to acquire, and which must be taken from a project rendered "economically untenable" by reason of the deprivation thereof. To do this a strict interpretation must be given to mere general statements and declarations in adjudicated cases never intended to apply to such a state of facts as that before us. Such a construction seems to me to do violence to the authorities and destroy a fundamental principle in irrigation law.

From territorial days down through our constitution, statutes, and all adjudicated cases, a single purpose has been kept constantly in view, and in times of doubt has been controlling—the necessity for the enactment of such legislation, and such a construction thereof, as would be a constant encouragement to irrigation development, to the initiation of new enterprises and the security of all rights established under those completed in the past. The affirmance of this judgment, and the declaration of the principle of law necessary thereto, can never be of the slightest disadvantage to vested rights, but its reversal, and the contrary declaration thereby necessitated, will, at least until relief has been furnished by further legislation, be a death blow to storage projects in the future. The threat becomes doubly ominous when we remember that the future of the state rests largely upon agricultural development, and this in turn upon irrigation by storage. The waters of the state have been so generally appropriated that the day of direct irrigation enterprises is closing, while that of storage has scarcely more than dawned. Seepage from practically all storage projects is so general, and ordinarily so extensive, that if the promoters thereof be told in advance that all such percolation is lost to them forever, that it may under no circumstances be recaptured, reclaimed, or conserved, save by the construction of absolutely impervious works, few men will have the hardihood to take the risks which

such a limitation imposes, and much of the good work done by this court in the past must be undone.

I think the only authority for this reversal is dictum and the only principle a departure, and that the judgment should be affirmed.

I am authorized to say that MR. JUSTICE DENISON concurs in this opinion.